## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GRETCHEN W. REAVES, for the use and benefit of the FEDERATED KAUFMANN FUND, | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | Civil Action No. 2:05cv0201 Judge David S. Cercone |
| v. | ) ) | **Electronic Filing** |
| FEDERATED INVESTORS, INC., et al. | ) ) | |
| Defendants | ) ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, Gretchen W. Reaves, on behalf of and for the benefit of Federated Kaufmann Fund, one of a Series or separate portfolios that comprise Federated Equity Funds, an investment company registered under the Investment Company Act of 1940, 15 USC Sec. 80a-1, *et seq.* (the "Investment Company Act"), sues defendants, Federated Investors, Inc., a company having shares listed on the New York Stock Exchange, and its wholly owned subsidiaries or affiliates, Federated Equity Management Company of Pennsylvania, Federated Securities Corp., Federated Global Investment Management Corp., Federated Investment Management Company, Federated Services Company, and Federated Shareholder Services Company, and alleges:

### I. JURISDICTION AND VENUE

1.     This action is brought by Plaintiff for the benefit of and on behalf of Federated Kaufmann Fund.   It was originally filed in the United States District Court for the Western District of Tennessee on June 25, 2004, as Case No. 04-2475, and was transferred to the United

States District Court for the Western District of Pennsylvania on February 17, 2005, as Civil Action Case No. 05-0201.   Counts I, III, and IV, are brought pursuant to Sec. 36(b) of the Investment Company Act of 1940, 15 U.S.C. Sec. 80a-35(b).  Count II is brought derivatively pursuant to Sec. 215 of the Investment Advisers Act of 1940, 15 U.S.C. Sec. 80b-15,  for violations of Sec. 206 of the Investment Advisers Act of 1940,  15 U.S.C. Sec. 80b- 6.

2.       This Court has subject matter jurisdiction pursuant to 15 U.S.C. Sec. 80a-43, 15 U.S.C. Sec. 80a-35(b)(5), 28 U.S.C. Sec. 1331, and 15 U.S.C. Sec. 80b-15.

3.       Venue is proper in this judicial district pursuant to 15 U.S.C. Sec. 80a-43 and 28 U.S.C. Sec. 1391(b)(2)-(3). A substantial part of the events and omissions that give rise to Plaintiff's claims occurred in this district and Defendants may be found in this district.

4.    No pre-suit demand on the Board of Trustees of Federated Equity Funds, the Board overseeing Federated Kaufmann Fund, is required with respect to Counts I, III, and IV, as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under Sec. 36(b) of the Investment Company Act of 1940. *Daily Income Fund, Inc. v. Fox*, 464 U.St. 523 (1984).  Plaintiff through her attorneys has made a demand on the said Board of Trustees for redress of the matters complained of in the Original Complaint and in the Amended Complaint, which is believed to be sufficient to support a derivative action pursuant to Count II. In the alternative, the Board's rejection of the demand already made demonstrates the futility of making any further demand.

## II. NATURE OF THE ACTION

5. The Investment Company Act of 1940, 15 U.S.C. Sections 80a-1 *et seq.,* (the "Investment Company Act") was initially enacted by the U.S. Congress in 1940 to regulate abuses in the investment company industry through creating a system of registration and

regulation for investment companies and their investment advisers by establishing standards of conduct by entities and individuals providing services to such registered investment companies. In a major amendment of the Investment Company Act in 1970, Congress added Sec. 36(b), 15 U.S.C. Sec. 80a-35(b) (hereafter "Sec. 36(b)"), which established a fiduciary duty with respect to compensation or payments paid by the investment company, or by its security holders,  to the investment adviser or to an affiliated person of such adviser. Sec. 36(b) also created a judicial remedy for breach of such fiduciary duty by authorizing suit against such investment adviser, its affiliates, and certain others by the Securities and Exchange Commission ("SEC" or the "Commission") or by a security holder of the investment company on behalf of the investment company with respect to payments made to such entities or persons by the investment company or by the security holders thereof.  Sec. 36(b) states in pertinent part:

> "For purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in the respect of such compensation or payments paid by such registered investment company or the security holders thereof to such investment adviser or person. …"

Such an action may be brought only against the recipient of the compensation challenged, no reward for damages may be recovered for any period prior to one year before the action was instituted, and any award for damages shall be limited to the actual damages resulting from the breach of fiduciary duty and shall not exceed the amounts of compensation or payments received from the investment company or the security holders by the recipient. Sec. 36(b)(3) of the

3

Investment Company Act, 15 USC 80a-35(b)(3). The action may be brought in an appropriate district court of the United States. Sec. 36(b)(5) of the Investment Company Act, 15 USC 80a-35(b)(5). The action is deemed to be equitable in nature, and there is no right to a jury trial. *Kalish v. Franklin Advisers, Inc.,* (C.A. 2, 1991), 928 F. 2d 590, *cert. denied*, 502 U.S. 818 (1991).

6. The Investment Advisers Act of 1940, 15 U.S.C. Sections 80b-1 *et seq.* (the "Investment Advisers Act"), was initially enacted by the U.S. Congress in 1940 to regulate abuses in the investment adviser industry through creating a system of registration and regulation for investment advisers that served investment companies and other accounts through establishing standards of conduct by entities and individuals providing services to such registered investment companies and other advisory accounts. The United States Supreme Court has held that there is a private right of action under Sec. 215 of the Investment Advisers Act for rescission of an investment advisory agreement for fraud and deceit and breaches of fiduciary duty, and that restitution may be claimed. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 144 US 11 (1979).

### III. Parties

7. Plaintiff Gretchen W. Reaves is a resident of Memphis and Shelby County, Tennessee. She has been a Class K Shareholder of Federated Kaufmann Fund since its inception, and was a shareholder of Kaufmann Fund, Inc. ("Old Kaufmann") before the reorganization in 2001 pursuant to which it became Federated Kaufmann Fund. The shares owned by Plaintiff were purchased directly from Old Kaufmann. Plaintiff's allegations as set forth hereafter are predicated on the public disclosure materials as filed with the SEC by Federated Equity Funds and its various Series, including Federated Kaufmann Fund, and by Federated Investors, Inc. (the

"Federated Disclosure Materials"), the public disclosure materials filed with the SEC by Old Kaufmann, and on information and belief.

8.      Federated Kaufmann Fund, the mutual fund on whose behalf this action is brought, is a Series or portfolio of Federated Equity Funds, a common law business trust organized in the Commonwealth of Massachusetts and having multiple Series. Federated Equity Funds, referred to herein as the "umbrella entity", is a single legal entity organized under a single Declaration of Trust with numerous amendments. Federated Equity Funds has a single Board of Trustees that oversees all of the multiple Series that are components of the Trust or umbrella entity, including Federated Kaufmann Fund. Federated Equity Funds is registered under a single registration statement on Form N-1A with the SEC as an open-end investment company under Sec. 8 of the Investment Company Act, 15 U.S.C. Sec. 80a-8 (technically, a "management company" as defined in Sec. 4(3), 15 USC Sec. 80a-4(3) that is sub-classified as an "Open-end company" under Sec. 5(a)(1), 15 USC Sec. 80a-5(a)(1) which issues redeemable shares). This single registration statement (Securities Act of 1933 File No. 2-91090 and Investment Company Act of 1940 File No. 811-4017) has numerous Post-Effective Amendments and financial statement filings relating to its multiple Series that include filings for Federated Kaufmann Fund as well as filings for all of the other Series that comprise Federated Equity Funds. The investment objective of Federated Kaufmann Fund is capital appreciation, and it invests principally in common stocks or equity securities and is generally classified as an equity investment company or mutual fund. The Class K Shareholders of Federated Kaufmann Fund are a class of security holders comprised of those shareholders of Old Kaufmann who participated in the reorganization pursuant to which Old Kaufmann became Federated Kaufmann Fund.

9.      Defendant Federated Investors, Inc. is a public corporation organized under the laws of the State of Pennsylvania which has a class of shares listed on the New York Stock Exchange. The New York Stock Exchange ticker symbol for Federated Investors is FII, and hereinafter Federated Investors, Inc. will be referred to as "FII".  FII has numerous subsidiaries and affiliates that perform a variety of investment management, administrative, and operational services for a large number of investment companies or mutual funds and managed accounts (the "Federated Fund Complex"). The Federated Fund Complex has total assets under management exceeding $179 billion at the close of 2004, ranking it as one of the larger mutual fund complexes in the United States.  Many of the directors and/or key officers of FII are directors and/or key executives of FII's operating subsidiaries. FII, through these directors, key executives and stock ownership, controls the boards of directors and management of these operating subsidiaries, which are under its common control, and FII is an active participant in the wrongful conduct alleged herein. Hereinafter, "Federated Management" will be used to refer collectively to the multiple management and operating entities that comprise FII's mutual fund management organization.

10.     Defendant Federated Equity Management Company of Pennsylvania ("FEMCO"), a Delaware statutory trust, is registered as an investment adviser under the Investment Advisers Act of 1940 ("the Investment Advisers Act"). FEMCO is currently the investment adviser to Federated Kaufmann Fund.

11.     Defendant Federated Investment Management Company ("FIMCO)", a Delaware statutory trust, is registered as an investment adviser under the Investment Advisers Act. FIMCO was the investment adviser to Federated Kaufmann Fund until December 31, 2003.

12.     Defendant Federated Global Investment Management Corp. ("FGIMCO"), a Delaware corporation, is registered as an investment adviser under the Investment Advisers Act. FGIMCO is the sub-adviser to Federated Kaufmann Fund. FEMCO, presently the primary investment adviser, and FIMCO, the primary investment adviser prior to December 31, 2003, have each delegated daily investment management of Federated Kaufmann Fund's securities portfolio to FGIMCO, and FGIMCO is paid a portion of the investment advisory fee currently received by FEMCO and was paid a portion of the investment advisory fee previously received by FIMCO prior to December 31, 2003.

13.     Defendant Federated Securities Corp. ("FSecC"), a Pennsylvania corporation, is registered as a broker/dealer under the Securities Exchange Act of 1934. FSC is the principal underwriter and distributor of Federated Kaufmann Fund.

14.     Defendant Federated Shareholder Services Company ("FSSC"), a Delaware statutory trust and a transfer agent registered under the Securities Exchange Act of 1934, provided transfer agent services for and maintained shareholder records for Federated Equity Funds, including Federated Kaufmann Fund, until mid-2004.

15.     Defendant Federated Services Company ("FSC"), a Delaware statutory trust, is the immediate parent of Defendant Federated Shareholders Services Company, and provided transfer agent services and maintained account records for Federated Equity Funds, including Federated Kaufmann Fund,  through its subsidiary, FSSC, until mid-2005.

16.     Defendant FII is a holding company and is the ultimate parent of FEMCO, FIMCO, FSecC, FGIMCO, FSC, and FSSC, all of which are under its common control and all of which accordingly are "affiliated persons" of FII and for the same reasons are also "affiliated persons" of each other as defined in Sec. 2(a)(3) of the Investment Company Act, 15 USC Sec.

80a-2(a)(3). The financial statements of FII's subsidiaries are consolidated with the financial statements of FII for public financial reporting purposes, and the profits FII receives from its numerous subsidiaries and affiliates for providing services to the Federated Fund Complex that includes Federated Kaufmann Fund are used to provide the dividends paid by FII to its shareholders.  FII is therefore the beneficiary and ultimate recipient of fees received by its subsidiaries and affiliates for providing services to the Federated Fund Complex.

## IV. Background of Organization of Federated Kaufmann Fund

17.    An investment company registered with the SEC, such as Federated Kaufmann Fund, generally has no employees and all operational functions such as investment management, fund administration, fund accounting, custodial services, and other fund operational functions and services are provided under contract by or through the investment manager or are provided directly by other outside service providers.

18.  From about 1986 to April of 2001, Kaufmann Fund, Inc.  ("Old Kaufmann") was an investment company or mutual fund based in New York City and managed by Edgemont Asset Management, Inc. ("Edgemont"), a privately held investment adviser with no other mutual funds under its management. With respect to Old Kaufmann, Edgemont served as investment adviser and, either directly or through subsidiaries, provided fund administration services. Other functions such as transfer agency and custodial services were provided directly by non-affiliated entities.

19. The primary sales distribution channel for Old Kaufmann was direct marketing to potential shareholders through its affiliated principal underwriter and distributor. Direct

purchasers did not pay "front-end" sales charges or sales loads deducted from an investor's initial investment proceeds.

20. Shares in Old Kaufmann were also sold through the so-called "mutual fund supermarkets" that generally sell no-load mutual funds or funds with no front-end sales charges, but which may have asset-based Investment Company Act Rule 12b-1 Distribution Plans. Two such mutual fund supermarkets used by Old Kaufmann were Charles Schwab & Company, Inc. and National Financial Services Corp. Old Kaufmann had an asset-based Investment Company Act Rule 12b-1 Distribution Plan with a fee of up to 0.75% (75 basis points) per annum of fund assets ("12b-1 Distribution Fee"), which was used primarily to pay for extensive advertisements in the print and electronic media supporting the Fund's direct sales to the general public together with the necessary marketing materials. During the late 1980's and throughout most of the 1990's, Old Kaufmann was heavily advertised in the print and electronic media and these advertisements were financed by the Fund's Rule 12b-1 Distribution Fee. A portion of this Rule 12b-1 Distribution Fee was also used to pay the mutual fund supermarkets their required fees and costs for broker-dealer account record-keeping for clients who were fund shareholders, services to fund shareholders who were funds clients and for selling fund shares.

21. In October of 2000, Old Kaufmann and Edgemont announced that an FII subsidiary, FIMCO, would become the new investment adviser for Old Kaufmann through a corporate reorganization. Old Kaufmann, then a Maryland corporation, would sell its assets to a newly created Series of Federated Equity Funds, an existing Massachusetts business trust formed by FII or one of its subsidiaries, and the new Series would be named "Federated Kaufmann Fund". Old Kaufmann would receive "Class K Shares" of Federated Kaufmann Fund in exchange for its assets, and these Class K Shares would be distributed in a tax-free exchange to

Old Kaufmann shareholders, who then would become Federated Kaufmann Fund's "Class K Shareholders."

22.     Edgemont charged Old Kaufmann a general management fee of 1.50% per annum of average net assets that combined the services of portfolio investment management and research together with the function of fund administration. There were no breakpoints reducing the percentage-based management fee as assets increase. A management fee of 1.50% with no breakpoints is generally regarded in the mutual fund industry as being high for a domestic equity fund such as Old Kaufmann and its disclosure materials have so stated from time to time. This investment management fee covered the "day to day investment operations of the fund," which comprised all investment management and research as well as portfolio administration services. See Exhibit A.

23.     In connection with the reorganization of Old Kaufmann into Federated Kaufmann Fund (the "Federated Kaufmann Reorganization"), Federated Management elected to retain an aggregate investment management fee of approximately 1.50%, even though the investment advisory fee charged most mutual funds in the Federated Fund Complex for equity fund portfolio management at that time was 0.75% per annum (75 basis points). Under the structure of the Federated Fund Complex, investment advisory fees are charged solely for the investment advisory function and such investment advisory fees do not include compensation for portfolio administration or accounting or other fund administrative services. In the Federated Fund Complex, each fund has a separate fund administration fee, designed to cover among other things portfolio accounting services with respect to the portfolio of securities and the preparation of fund financial statements. The fund administration fee is calculated by reference to the total assets of all mutual funds in the Federated Fund Complex, and has amounted to approximately

0.075% (7.5 basis points) of average fund assets of all funds in the Federated Fund Complex. In connection with the proposed reorganization, Federated Management separated the investment advisory fee and the fund administration fee for the new Federated Kaufmann Fund, and an investment advisory fee of 1.425% was assigned for the sole service of investment advice or portfolio management. Federated Kaufmann Fund was to be charged the standard fund administration fee that was applicable to other mutual funds in the Federated Fund Complex that approximates 0.075% of assets per annum (7.5 basis points), resulting in a combined management fee of approximately 1.50% of assets per annum for the same investment advisory and administrative services as had been provided for Old Kaufmann for its management fee of 1.50% of assets.

24.     The disclosure materials filed with the Securities and Exchange Commission for Federated Kaufmann Fund (the "Federated Disclosure Materials") state that FIMCO, the Federated Investors subsidiary that served through December 31, 2003 as the primary investment adviser for Federated Kaufmann Fund, has delegated the "daily management" of the Fund's assets  (a phrase substantially similar to the phrase "day to day investment operations" used in the disclosure materials for Old Kaufmann to include all investment management and investment research operations) through a sub-advisory agreement to another FII subsidiary, FGIMCO, for a fee of 1.175% per annum. See Exhibit B. No information is given as to the need to continue charging Federated Kaufmann Fund a total investment advisory fee of 1.425% after the "daily management" of the Fund's assets has been delegated to a sub-advisor for a fee of 1.175%, and there is no explanation or disclosure of any separate services performed by the primary manager justifying the extent of the incremental difference between the primary investment advisory fee of 1.425% of assets and the sub-advisory fee of 1.175% of assets. Most other equity funds

managed by Federated Management pay a primary investment advisory fee of 0.75% of assets per annum for full investment advisory services, in contrast to Federated Kaufmann Fund's sub-advisory fee of 1.175% for investment advice. After December 31, 2003, FEMCO became the investment adviser to Federated Kaufmann Fund, but there has been no change in the investment advisory fees charged Federated Kaufmann Fund.

25.     Federated Management also modified other fees previously applicable to Old Kaufmann.  Old Kaufmann had an Investment Company Act "Rule 12b-1 Distribution Fee." Such a fee is an asset-based fee, calculated as a percentage of fund assets that is collected from the mutual fund by its affiliated principal underwriter or affiliated distributor and then is used to pay for a variety of distribution and promotional expenses. Old Kaufmann's Rule 12b-1 Distribution Fee could be as much as 0.75% on total assets (75 basis points), and was used primarily by its affiliated principal underwriter or affiliated distributor to pay for extensive media advertising and attendant advertising and promotional expenses. Although this fee could have been as much as 0.75% or 75 basis points, the actual Rule 12b-1 Distribution Fee was generally less than 0.50% or 50 basis points and, during fiscal 1999 and 2000 amounted to approximately 0.36% of average assets or 36 basis points. Federated Management continued the 12b-1 Distribution Fee for Federated Kaufmann Fund Class K Shareholders but reduced the maximum fee that could be charged to 0.50% of assets or 50 basis points. Because Old Kaufmann's Rule 12b-1 Distribution expenses had generally been less than 0.50%, reduction in the maximum fee that could be charged did not result in a reduction in actual expenses incurred by Federated Kaufmann Fund thereafter.

26. Federated Management added a separate "Shareholder Services Fee" applicable to the Class K Shares to be paid by Federated Kaufmann Fund that could be as much as 0.25% per

annum of assets (25 basis points) and that would be paid in addition to the Rule 12b-1 Distribution Fee of as much as 0.50%. Because the Shareholder Services Fee is an additional fee not previously paid by Old Kaufmann, it has the effect of increasing the total expenses payable by Federated Kaufmann Fund with respect to the Class K Shares.  Such a Shareholder Services Fee is generally used to pay non-affiliated, retail broker/dealers that charge commissions for selling mutual fund shares for special services provided to their clients who invest in a mutual fund as well as to cover the expenses of account record-keeping by the broker-dealer for the broker/dealer's clients. Also, a Shareholder Services Fee might be used as "revenue sharing" for purchasing "shelf space" to encourage the selling of a particular mutual fund by the non-affiliated broker/dealer's representatives. Generally such service fees are not necessary in situations where the shareholder group is composed primarily of investors who purchased directly from the fund organization, such as the overwhelming majority of shareholders of Old Kaufmann who became the Class K Shareholders of Federated Kaufmann Fund, because such shareholders did not purchase their shares through non-affiliated broker/dealers and accordingly did not receive services from non-affiliated broker/dealers. In addition, compensation to acquire shelf space from non-affiliated broker/dealers is not necessary because the overwhelming majority of Old Kaufmann's shares were not sold through such a distribution channel and Class K Shares presently are not sold through such a distribution channel.

27.    The Federated Kaufmann Reorganization proposal, with the fee structure described above, was duly submitted to Old Kaufmann shareholders in early 2001, and ultimately was approved by the requisite shareholder vote in April of 2001. The reorganization was promptly implemented thereafter. At that point, the shareholders of Old Kaufmann, who became the Class K Shareholders of Federated Kaufmann Fund, were the only shareholders of

Federated Kaufmann Fund, then composed solely of approximately $3.4 billion in assets obtained from Old Kaufmann. At that time, the total assets under the jurisdiction of Federated Management exceeded $130 billion. Old Kaufmann shareholders who became the Class K Shareholders of Federated Kaufmann Fund were thus the only shareholders of the newly formed Federated Kaufmann Fund at the outset and made its very existence possible.

28.     Pursuant to the Federated Kaufmann Reorganization, the Class K Shares of Federated Kaufmann Fund were distributed to Old Kaufmann shareholders in exchange for their shares of Old Kaufmann. Class K Shares were then closed to new direct investors after the Federated Kaufmann Reorganization. Federated Kaufmann Fund Class K Shareholders were permitted to add investments to their existing accounts without payment of any sales loads, and brokerage firms and consultants having pre-existing relationships with Old Kaufmann (such as the Charles Schwab & Co. Inc. and National Financial Services Corp.'s mutual fund super markets) could invest additional funds for existing clients. Such brokerage firms could also add new clients as Class K Shareholders on the same terms as before the Federated Kaufmann Reorganization, without payment of sales charges deducted from investment proceeds.

## V. Operations of Federated Kaufmann Fund
### Subsequent to Federated Kaufmann Reorganization

29. At the time of the Federated Kaufmann Reorganization, the Board of Trustees of Federated Equity Funds, the umbrella entity, created three new classes of shares having specified sales loads and 12b-1 Distribution Fees for Federated Kaufmann Fund. These three new classes of shares, Class A, Class B, and Class C Shares, corresponded to the class structure of other mutual funds in the Federated Fund Complex and would be distributed primarily through non-affiliated broker/dealers as are the shares of other mutual funds in the Federated Fund Complex,

14

which also have the same Class A, Class B, and Class C structure. Shares in these classes can also be purchased directly from the Fund's affiliated distributor upon payment of the required sales charges. Although the assets attributable to the Class A, Class B, and Class C shares of Federated Kaufmann Fund have increased through new sales, the Old Kaufmann shareholders who became Federated Kaufmann Fund Class K Shareholders remain the largest class of shares of Federated Kaufmann Fund. They constituted approximately 60% of Federated Kaufmann Fund's assets at October 31, 2003, the close of the most recent fiscal year prior to the filing of this Complaint, and constituted approximately 49% of assets at October 31, 2005. Additionally, Federated Kaufmann Fund's Class K Shareholders constitute one of the largest if not the largest class of equity shareholders in the entire Federated Fund Complex and Federated Kaufmann Fund is the largest equity fund in the Federated Fund Complex.

30. The Class K Shareholders have not enjoyed the benefits of economies of scale that should have been generated by the Federated Kaufmann Reorganization. To the contrary, the overall structure of fees charged by Federated Management, most calculated as a percentage of assets with no breakpoint reductions as assets increase, coupled with certain higher operating expenses incurred by Federated Kaufmann Fund, have  had the effect of increasing the total fees and operating expenses applicable to the Class K Shareholders of Federated Kaufmann Fund to an amount greater than the total fees and operating expenses that were applicable for the same class of shareholders when they were the  single class of  shareholders of Old Kaufmann.

31.  FII through certain subsidiaries has "voluntarily" limited total operating expenses of the Federated Kaufmann Fund to 1.95% per annum of average net assets. This expense ratio cap is equal to the operating expense ratio experienced by Old Kaufmann for the fiscal year ended December 31, 1999, the last year that audited financial statements were available prior to

issuance of the Proxy Statement with respect to the proposed reorganization, but is higher than the actual operating expense ratio of 1.89% per annum experienced by Old Kaufmann during its last full fiscal year ended December 31, 2000. The formal fee structure and other expenses that were imposed at the outset by Federated Management on the Class K Shareholders of Federated Kaufmann Fund can be as much as 2.40% and this fee structure is so high that the combination of formal fees paid by Federated Kaufmann Fund to Federated Management and other higher operating expenses will always substantially exceed the voluntary 1.95% Expense Limitation Cap. For example, the total expense ratio in the absence of the voluntary 1.95% Limitation Cap applicable to Class K Shareholders for the fiscal year ended October 31, 2003 was approximately 2.46%. Because there are no breakpoints in the fees that are charged as a percentage of assets, the total operating expense ratio for Class K Shareholders of Federated Kaufmann Fund will never be less than the 1.95% "voluntary" expense limitation that was applicable to Old Kaufmann during 1999, regardless of any future growth in assets.  Thus, Federated Kaufmann Fund's Class K Shareholders that made Federated Kaufmann Fund's very existence possible will never be able to realize any economies of scale that should result from increases in the Fund's assets or that should result from Federated Management's vastly greater corporate support structure that manages significantly larger combined assets. Yet other, smaller equity funds and/or classes of shareholders in the Federated Fund Complex are allowed to pay investment advisory fees that are substantially less than 1.425% and/or have expense ratios substantially below the voluntary 1.95% Expense Limitation Cap per annum and are able to participate in economies of scale as assets rise, primarily because they pay substantially lower investment advisory fees.

32.     FII and/or its subsidiaries have discriminated against all classes of shareholders within Federated Kaufmann Fund and in favor of the other mutual funds that are part of Federated Equity Funds, the umbrella entity that includes Federated Kaufmann Fund, and numerous other mutual funds in the Federated Fund Complex by charging Federated Kaufmann Fund  excessive and discriminatory investment advisory fees and thereby failing to extend economies of scale to Federated Kaufmann Fund  that are realized by other, smaller  equity mutual funds that are part of Federated Equity Funds and also other mutual funds that are part of the Federated Fund Complex that are managed by Federated Management but that pay lower investment advisory fees and enjoy significant economies of scale.

**VI.  Use of Federated Kaufmann Fund to Increase Investment Advisory Fees Charged Other Federated Funds by Merging Such Funds Into Federated Kaufmann Fund**

33. Federated Kaufmann Fund has been used by Federated Management as a catalyst or vehicle to increase investment advisory fees charged certain other mutual funds within the Federated Fund Complex. Prior to the Kaufmann Fund Reorganization in 2001, Federated Investors operated a pre-existing small-cap fund as another series of Federated Equity Funds. After the original portfolio managers of Old Kaufmann had become employed by Federated Management in April of 2001, they were assigned overall supervision for the pre-existing small-cap fund's portfolio, and the pre-existing small-cap fund was shortly thereafter renamed "Federated Kaufmann Small-Cap Fund". However, the investment advisory fee then being paid by the pre-existing small-cap fund was 0.75% per annum, the investment advisory fee Federated Management charged the majority of its other equity funds, and the sub-advisory fee being charged by FGIMCO was only 0.15% of assets per year.

34. Federated Management devised a strategy using Federated Kaufmann Fund to increase the 0.75% investment advisory fee for its pre-existing small-cap fund to 1.425%, the fee being charged Federated Kaufmann Fund, and to increase the sub-advisory fee being charged by FGIMCO from 0.15% to 1.175%. In late 2001, Federated Management proposed a merger of the pre-existing small-cap fund, then re-named Federated Kaufmann Small-Cap Fund, into Federated Kaufmann Fund. The Proxy Statement submitted to the Federated Kaufmann Small-Cap Fund shareholders trumpeted the advantages of being a part of the much larger Federated Kaufmann Fund with a different portfolio and a much better performance record. The Proxy Statement also disclosed that Federated Kaufmann Fund had a higher investment advisory fee, but the overall emphasis was on the benefits the shareholders of Federated Kaufmann Small-Cap Fund would receive by becoming a part of the much larger, better performing Federated Kaufmann Fund.

35. Ultimately, Federated Kaufmann Fund Small-Cap Fund shareholders approved this merger and reorganization. Before its merger into Federated Kaufmann Fund, the assets of Federated Kaufmann Small-Cap Fund were approximately $235 million, while the assets of Federated Kaufmann Fund were approximately $3.9 billion. Rather than liquidating Federated Kaufmann Small-Cap Fund's portfolio and transferring cash to Federated Kaufmann Fund to implement the merger after shareholder approval, securities from the portfolio of Federated Kaufmann Small-Cap Fund, some having been selected using a different investment philosophy by different portfolio managers with a poorer performance record, were transferred to (or "dumped into") Federated Kaufmann Fund to implement the merger.

36. The Federated Disclosure Materials indicate that the Board of Trustees determined that the merger would be "beneficial" to shareholders of Federated  Small-Cap Fund and would not be "dilutive" to Federated Kaufmann Fund. No finding was made that the merger would be

"beneficial" to Federated Kaufmann Fund or its shareholders, who were not allowed to vote on the merger, and nothing was said in any Federated Disclosure Materials about the possible detriment to Federated Kaufmann Fund's existing shareholders of forcing that Fund to absorb portfolio securities of another fund with a different investment philosophy owning securities selected in a different manner by different portfolio managers. The securities transferred had lesser average unrealized appreciation than the average of the securities held in Federated Kaufmann Fund's portfolio, thus potentially diluting the investment performance of Federated Kaufmann Fund and forcing all of its shareholders to absorb the tax impacts and cover the brokerage commissions incurred when shares of portfolio companies of the pre-existing small-cap fund were thereafter sold.

37.  Prior to implementation of this merger of Federated Kaufmann Fund and Federated Kaufmann Small-Cap Fund, Federated Management had filed a registration statement with the SEC for a newly created small-cap fund to be a new Series or portfolio of Federated Equity Funds. This new Series would have a higher investment advisory fee and higher overall fee and expense structure cloning that of Federated Kaufmann Fund. After the merger of the pre-existing Federated Kaufmann Small-Cap Fund into Federated Kaufmann Fund, Federated Management amended that registration statement, which was not yet effective, and re-named the  new small-cap Series or portfolio "Federated Kaufmann Small-Cap Fund", the same name formerly used by the pre-existing Small-Cap Fund that had been merged into Federated Kaufmann Fund.

38.  By this course of action, Federated Management had increased the investment advisory fee for the shareholders of the previously existing small-cap fund by merging that fund into Federated Kaufmann Fund. Federated Management had then created a new Federated Kaufmann Fund Small-Cap Fund with a higher advisory fee and overall fee and expense

structure cloning that of Federated Kaufmann Fund, and these fees and expenses became applicable to new shareholders. An additional benefit to Federated Management of merging or "dumping" the assets of the pre-existing small-cap fund into Federated Kaufmann Fund was the elimination of the poorer investment performance record of the pre-existing small-cap fund, facilitating the marketing of the newly created small-cap fund under the same name without the burden of the poorer performance record of the pre-existing small-cap fund.

39. Federated has merged three other equity funds having lower investment advisory fees and also having different investment philosophies and  poorer performance records into Federated Kaufmann Fund, thereby increasing the investment advisory fees for those shareholders as well.  There has been no public statement as to how the Board of Trustees of Federated Equity Funds, the umbrella entity that includes Federated Kaufmann Fund, determined that any of these mergers benefited Federated Kaufmann Fund or its shareholders, and as discussed elsewhere herein, the Board's available time to consider complex issues is extremely limited. On information and belief, these mergers conferred no benefits on the shareholders of Federated Kaufmann Fund and had the effect primarily of increasing the investment advisory fees and other profits being realized by Federated Management from Federated Kaufmann Fund and concurrently reducing the expenses of Federated Management in operating and managing as separate entities the much smaller funds merged into Federated Kaufmann Fund.

## VII. Oversight of Federated Kaufmann Fund
## by Board of Trustees of Federated Equity Funds

40. An investment company registered with the SEC, such as Federated Equity Funds, generally has a board of directors or board of trustees, a majority of the members of which must

be independent or "disinterested" as defined in Sec. 2(a)(19) of the Investment Company Act, 15 USC Sec. 80a-2(a)(19).  The Federated Disclosure Materials indicate that the same Board of Trustees (or Board of Directors for mutual funds in the Federated Fund Complex organized as corporations), is composed of the same twelve persons, nine of whom are identified as "independent" or "non-interested", and that this single Board oversees all of the approximately 138 mutual funds in the Federated Fund Complex. No public information is disclosed on the frequency or length of the meetings of these boards or trustees or boards of directors. But, for example, if the boards should meet six times a year in alternate months, and each meeting session lasts four full eight-hour days, a total of 24 eight-hour days annually, the Board would be able to spend on average less than 15 minutes on a particular mutual fund's issues per four-day session, and an average of less than 1 hour and 25 minutes on all of a particular mutual fund's issues for the entire year. Such issues would include the numerous corporate governance, portfolio management, portfolio pricing, audit and accounting issues that a Board must review annually under applicable statutes, rules and regulations in overseeing or governing a particular mutual fund, and would also include the annual renewals of the investment advisory agreements and the Rule 12b-1 Distribution Fee arrangements. Should less time be spent in board meetings, the average time per mutual fund declines proportionately.

41. The independent or "non-interested" directors or trustees are supposed to be "watch dogs" charged with the responsibility of protecting the interests of the shareholders in contract and fee negotiations with the management organization. Regardless of the sophistication and the individual educational and business qualifications of the nine independent members of the Board of Trustees of Federated Equity Funds, many of whom are otherwise fully employed in demanding positions of responsibility, such average limited meeting time per fund per session

and per fund per year is not sufficient to enable the Board of Trustees or Board of Directors of the mutual fund entities comprising the Federated Fund Complex to review and discuss meaningfully on behalf of a particular mutual fund the complex factual and legal issues that are involved in on-going operational matters or to engage in serious, arms-length bargaining in good faith on material fee issues related to a particular mutual fund, while contemporaneously for all 138 mutual funds completing the numerous other routine operating reviews and annual approvals required under the Investment Company Act of 1940 and its supporting rules and regulations. There is thus insufficient time available for and accordingly insufficient serious, good faith, arms-length bargaining on the part of the Board of Trustees of Federated Equity Funds with Federated Management on any special fee issues specifically involving Federated Kaufmann Fund or its Class K Shareholders.

42. In the required description with respect to the factors considered in the annual contract renewals, as set forth in Federated Kaufmann Fund's Statement of Additional Information ("SAI") prior to 2005, Federated Management admits that not all potentially relevant factors are considered with respect to each separate mutual fund, and that annual contract renewals for many mutual funds are reviewed in the aggregate rather than in a fund specific manner. The following discussion from Federated Kaufmann's SAI also implies that the overhead coverage and perhaps even the profitability of one or even many mutual funds may be attributed to another fund or funds in order to justify lower fees for some funds.  That discussion on page 93 of Federated Kaufmann Fund's SAI that was effective during 2004, states:

> "The Board bases its decision to approve an advisory contract on the totality of the circumstances and relevant factors, and with a view to past and future long-term considerations. Not all of the factors and considerations identified above are relevant to every Federated fund, nor does the Board consider any one of them to be determinative. **Because the totality of circumstances includes considering the relationship of each Federated fund, the Board does not approach consideration of every Federated**

**fund's advisory contract as if that were the only Federated fund offered by Federated."** (Emphasis added)

43. Federated Management thus has admitted in public disclosure materials that the Federated Trustees do not as a matter of practice consider separately the specific circumstances of a particular mutual fund in annual contract renewals as though it were the only mutual fund in the Federated Fund Complex. Instead, the Federated Trustees consider the "totality" of a number of circumstances involving many other mutual funds and their relationships within the Federated Fund Complex in the deliberations on annual contract renewals. This admission indicates that the overall cost structure and profitably of many funds are considered in the aggregate and may take precedence over a specific consideration of whether the fees and profitability of a single, large mutual fund such as Federated Kaufmann Fund, or the fees applicable to the Class K Shareholders, could be excessive when considered separately or could be blatantly discriminatory when compared specifically with other similarly situated mutual funds within the same legal entity or within the overall Federal Fund Complex.

44. The Federated Equity Funds Annual Report to the Class K Shareholders of Federated Kaufmann Fund for the fiscal year ended October 31, 2005, as filed with the SEC on December 29, 2005, contains the following new disclosure with respect to Federated Kaufmann Fund contract renewals.

> "… In the Board's view, the cost of performing advisory services on a fund-specific basis is both difficult to estimate satisfactorily and a relatively minor consideration in its overall evaluation. Analyzing isolated funds would require **constructed** allocations of the costs of shared resources and operations based on **artificial** assumptions that are inconsistent with the existing relationships within a large and diversified family of funds that receive advisory and other services from the same organization. In addition, the availability of the exchange privilege among funds in the Federated family makes consideration of the overall costs and profitability of Federated more relevant than that of individual funds. Based upon this review, the Board is satisfied that the costs incurred in, as well as the profitability realized from, managing the Fund [Federated Kaufmann] and

23

the other Federated Funds are appropriate. Although the Board is always interested in discovering any genuine "economies of scale" its experience has been that **such "economies" are likely to arise only when a fund grows dramatically, and becomes and remains very large in size.** …" (Emphasis added).  See  Exhibit C.

45. Federated Kaufmann Fund is the single equity fund in the entire Federated Fund Complex that satisfies the above definition of a fund that has " … grown dramatically and becomes and remains very large in size."  It has grown in assets from $3.4 billion when acquired from Old Kaufmann in April of 2001 to $7.8 billion in assets at October 31, 2005, and thus satisfies the test admittedly applied by the Federated Trustees in analyzing whether "… such 'economies' [of scale] are likely to arise …"  Not only is Federated Kaufmann Fund large in absolute terms, but it is also a significant percentage of FII's total group of managed equity mutual funds and accounts. According to the Annual Report on Form 10-K filed by FII for the fiscal years ended December 31, 2003 and 2004, FII reported that it managed a total of $25.6 billion and $29.0 billion, respectively, in equity assets.  Federated Kaufmann Fund, with approximately $5.8 billion in assets in 2003, and $6.9 billion in assets in 2004, constituted as a single equity mutual fund approximately 22% and 24% respectively, of total equity mutual fund assets and equity accounts under management at the close of 2004.  Federated Kaufmann Fund's net investment advisory fees of approximately $81.9 million for the 2004 fiscal year constituted approximately 15% of total investment advisory fees of $546.1 million received by FII from all sources, including investment advisory fees from fixed income and money market assets and accounts. In the absence of a fund specific analysis, the greater revenue received and greater profit contributions of a large mutual fund such as Federated Kaufmann Fund are overlooked or masked in the aggregate analysis when considered together with numerous other mutual funds, or are viewed by Federated Management or the Federated Trustees as supplementing and

therefore justifying the lower fees and/or lower profitability of the smaller mutual funds within

Federated Equity Funds or the Federated Fund Complex.


**COUNT  I.**

**INVESTMENT COMPANY ACT  Sec. 36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excessive and Discriminatory Investment Advisory Fees)**

46. Plaintiff repeats and re-alleges paragraphs 1 through 45, inclusive, of this complaint.

47. According to the Annual Report of Old Kaufmann for the fiscal year ended December

31, 2000, the last public report for Old Kaufmann prior to the Federated Kaufmann

Reorganization in April of 2001, Old Kaufmann had net assets of approximately $3,367,994,000

at that date.   Old Kaufmann was the only investment company managed by Edgemont, its

investment adviser at year-end. According to the joint Proxy Statement of Kaufmann Fund, Inc.

and Federated Kaufmann Fund, dated January 9, 2001 (the "Joint Proxy Statement") sent to

shareholders of Old Kaufmann seeking approval of the proposed Federated Kaufmann

Reorganization, it was reported that the Federated Fund Complex and FII's private or separately

managed accounts had combined total assets of approximately $130 billion, and included

approximately 185 other investment companies or mutual funds with over 1.3 million

shareholder accounts. FII together with its affiliates ("Federated Management") was portrayed as

one of the larger mutual fund investment managers in the United States, with approximately

1,900 employees and more than 4,000 investment professionals.  See Exhibit D.

48. The Joint Proxy Statement emphasized Federated Management's larger size in

comparison with Edgemont in seeking approval from shareholders for the Federated Kaufmann

Reorganization. At the outset of the Joint Proxy Statement (in a section entitled "WHY IS THIS

REORGANIZATION TAKING PLACE ?"), the response given was that a major consideration was " … Edgemont's ability to remain competitive in an environment where the amount of assets under management was becoming more and more important to running a successful mutual fund business". … and "… larger mutual fund companies would be in the best position to offer excellent products and services in the years ahead". It was also stated that … "Federated Investors with $130 billion of assets under management across a broad product line, is in a good position to provide such high-quality services to Kaufmann Fund shareholders". See Exhibit E.

49. Under the proposed Federated Kaufmann Reorganization, Old Kaufmann would become a Series or portfolio of Federated Equity Funds, a common law Massachusetts business trust that would serve as the umbrella entity for the new Federated Kaufmann Fund. The October 31, 2000 Annual Report for the Federated Equity Funds, the latest reporting period prior to the reorganization of Old Kaufmann into Federated Kaufmann Fund, discloses that Federated Equity Funds, the umbrella entity, was then composed of at least seven other publicly offered Series or portfolios of equity funds, all of which had lesser assets and lower investment advisory fees than Old Kaufmann. These Series or portfolios, with their approximate total assets and investment advisory fees, in comparison with Old Kaufmann's approximate total assets and investment advisory fees for its last fiscal year prior to the merger were:

| Name of Series | Approximate Assets | % Investment Advisory Fee | Advisory Fees For Fiscal Year |
|---|---|---|---|
| Federated Aggressive Growth Fund | $389,000,000 | 1.00% | $2,280,883 |
| Federated Capital Appreciation Fund | 945,000,000 | 0.75% | 4,707,785 |
| Federated Large Cap Growth Fund | 885,000,000 | 0.75% | 5,195,087 |
| Federal New Economy Fund | 35,000,000 | 1.25% | 40,280 |
| Federated Small-Cap Strategies Fund | 382,000,000 | 0.75% | 3,198,116 |
| Federated Growth Strategies Fund | 1,715,000,000 | 0.75% | 11,655,341 |
| Federated Communications Tech. Fd. | 813,000,000 | 0.75% | 5,582,883 |
| **Totals** | **$5,164,000,000** | | **$32,660,375** |
| | | | |
| **Old Kaufmann Fund** (Year Prior to Merger) | **$3,367,000,000** | 1.50% | **$54,427,000** |

Thus, prior to the Federated Kaufmann Reorganization, Old Kaufmann's assets constituted approximately 65% of the total assets of Federated Equity Funds, the Massachusetts business trust of which it would become a part, while its separate investment advisory fee was approximately 167% of the aggregate investment advisory fees of the other seven series combined, illustrating its much higher investment advisory fee structure.

50. The Joint Proxy Statement sent to Old Kaufmann shareholders seeking approval of the proposed reorganization, while emphasizing Federated Management's much greater size in terms of total assets under management and numbers of personnel, did not disclose that, after the Federated Kaufmann Reorganization, the assets of Old Kaufmann of approximately $3.4 billion would comprise the largest Series or portfolio in the Federated Equity Funds umbrella, and in fact would constitute more than a majority of its total assets; that with an investment advisory fee of 1.425% of assets, Federated Kaufmann Fund would be paying the highest investment advisory fee as a percentage of assets of any other equity fund that was a part of Federated Equity Funds, that it would be paying the highest investment advisory fee of any other equity fund managed by Federated Management; that Federated Management would be managing similarly situated "brother/sister" equity mutual funds of Federated Kaufmann Fund in Federated Equity funds as well as other equity mutual funds or privately managed equity accounts at lower investment advisory fees even though assets of these mutual funds or private accounts were far smaller; or that Federated Management, unlike its practice with other pre-existing, similarly situated "brother/sister" funds having lesser assets, would never extend any economies of scale to Federated Kaufmann Fund if its assets increased because of the excessively high and discriminatory overall fee schedule and expense structure that Federated Management would impose on Federated Kaufmann Fund.

51. Federated management represented as an enticement for a favorable shareholder vote that the total expense ratio of Federated Kaufmann Fund would not exceed 1.95% of assets because Federated Management, through a "voluntary" expense limitation, would cap the operating expenses at a maximum of 1.95% of assets for at least two years. The 1.95% operating expense ratio was the ratio actually experienced by Old Kaufmann during fiscal 1999, the last fiscal year for which audited financial statements were published before issuance of the Proxy Statement seeking shareholder approval for the Federated Kaufmann Reorganization. Old Kaufmann's expense ratio for fiscal 2000, its last full fiscal year or operations before the reorganization in April of 2001 was 1.89%. However, Federated Management did not inform Old Kaufmann shareholders of this lower actual operating expense ratio before the shareholder vote, nor did it adopt of its own volition this lower ratio as the on-going expense cap for Federated Kaufmann Fund. The voluntary 1.95% Operating Expense Cap adopted in 2001 can be voided at Federated Management's sole discretion, but was still in effect at October 31, 2005.

52. With respect to Federated Equity Funds, the umbrella entity that includes Federated Kaufmann Fund, Federated Management charges substantially lower investment advisory fees of 0.75% of assets per annum to the brother-sister Series to Federated Kaufmann Fund. The Annual Reports to Shareholders for the fiscal years ended October 31, 2003, 2004, and 2005 shows that Federated Equity Funds has been composed of  seven major Series or portfolios, with assets and advisory fees, as follows:

### October 31, 2003

| Name of Series | Approximate Assets | % Investment Advisory Fee | Advisory Fees For Fiscal Year (after waivers) |
|---|---|---|---|
| Federated Capital Appreciation Fund | $2,900,000,000 | 0.75% | $17,368,038 |
| Federated Technology Fund | 143,600,000 | 0.75% | 886,003 |
| Federated Growth Strategies Fund | 702,600,000 | 0.75% | 4,638,351 |
| Federated Large Cap Growth Fund | 279,700,000 | 0.75% | 1,986,288 |

| Name of Series | Approximate Assets | % Investment Advisory Fee | Advisory Fees For Fiscal Year (after waivers) |
|---|---|---|---|
| Federated Market Opportunity Fund | 918,600,000 | 0.75% | 4,636,674 |
| **Federated Kaufman Fund** | **5,808,800,000** | **1.425%** | **53,265,731** |
| Federated Kaufman Fund Small-Cap Fund | 212,200,000 | 1.425% | 684,620 |
| **Totals** | **$10,965,500,000** | | **$83,465,705** |

### October 31, 2004

| Name of Series | Approximate Assets | % Investment Advisory Fee | Advisory Fees For Fiscal Year (after waivers) |
|---|---|---|---|
| Federated Capital Appreciation Fund | $3,399,400,000 | 0.75% | $24,306,401 |
| Federated Technology Fund | 114,600,000 | 0.75% | 1,000,279 |
| Federated Growth Strategies Fund | 664,500,000 | 0.75% | 5,198,504 |
| Federated Large Cap Growth Fund | 254,687,000 | 0.75% | 2,074,315 |
| Federated Market Opportunity Fund | 1,943,800,,000 | 0.75% | 10,433,881 |
| **Federated Kaufman Fund** | **6,855,400,000** | **1.425%** | **81,991,326** |
| Federated Kaufman Fund Small-Cap Fund | 405,100,000 | 1.425% | 3,837,100 |
| **Totals** | **$13,637,500** | | **$126,767,491** |

### October 31, 2005

| Name of Series | Approximate Assets | % Investment Advisory Fee | Advisory Fees For Fiscal Year (after waivers) |
|---|---|---|---|
| Federated Capital Appreciation Fund | $2,925,600,000 | 0.75% | $24,763,596 |
| Federated Technology Fund | 88,500,000 | 0.75% | 643,322 |
| Federated Growth Strategies Fund | 679,400,000 | 0.75%* | 5,289,345 |
| Federated Large Cap Growth Fund | 194,900,000 | 0.75% | 1,785,098 |
| Federated Market Opportunity Fund | 2,716,100,000 | 0.75% | 17,674,572 |
| **Federated Kaufman Fund** | **7,849,500,000** | **1.425%** | **96,344,877** |
| Federated Kaufman Fund Small-Cap Fund | 641,000,000 | 1.425% | 6,884,914 |
| **Totals** | **$15,095,000** | | **$153,385,724** |

*Reduced to 0.4975% effective 1/1/2006 per settlement with New York State Attorney General

53. As illustrated by a comparison of the tables in Paragraphs 49 and 52, the total assets of Federated Equity Funds, the umbrella entity containing Federated Kaufmann Fund, have almost tripled since its acquisition, increasing from approximately $5.1 billion before the addition of Old Kaufmann's assets in 2001 to more than $15 billion at October 31, 2005, while the assets of Federated Kaufmann Fund have more than doubled from approximately $3.4 billion in 2001 to approximately $7.8 billion in 2005.

54. As shown in the table in Par. 49, two of the seven Series of Federated Equity Funds

at October 31, 2000 were paying investment advisory fees exceeding 0.75% per annum. Those two series were Federated Aggressive Growth Fund, with an advisory fee of 1.00% and Federated New Economy Fund, with an advisory fee of 1.25%.

55. With the exception of Federated Kaufmann Fund and its new cloned mutual fund, Federated Kaufmann Small-Cap Fund, created after the "dumping" of the assets of the pre-existing Federated Kaufmann Small-Cap Fund into Federated Kaufmann Fund, all of the other series of Federated Equity Funds, each one having lesser assets than Federated Kaufmann Fund, now all have the lower 0.75% investment advisory fee.

56. As shown in paragraphs 49 and 52, total investment advisory fees generated by the seven series comprising Federated Equity Funds had increased from approximately $32.6 million in October of 2000 before the addition of Old Kaufmann's assets to approximately $153 million at October 31, 2005, with Federated Kaufmann Fund then contributing approximately 60% of the total investment advisory fees for all series of the umbrella entity through its higher investment advisory fee of 1.425%. Total assets under management by Federated Management have increased from approximately $130 billion in 2001, when Federated Kaufmann Fund was formed, to more than $179 billion at the close of 2004, presenting opportunities for increased economies of scale that should have been shared with Federated Kaufmann Fund, the single Federated equity fund that has grown dramatically and has continued to be large.

57. The nature of the investment advisory functions and services Federated Management provides Federated Kaufmann Fund  are identical to the nature of the investment advisory functions and services Federated Management provides the other similarly situated "brother/sister" equity Series that are part of the same umbrella entity, Federated Equity Funds,

and these investment advisory functions and services when supplied to all funds in the same umbrella entity are all part of the same overall cost structure and are provided and/or are supported by the same staffs of personnel employed by Federated Management. In particular, the investment advisory fees charged the various Series that are a part of Federated Equity Funds are designed to cover the service of providing investment advice, portfolio management, and investment research to the various Series. Federated Management charges the mutual funds that are Series of Federated Equity Funds different or separate fees for other necessary portfolio accounting or administrative services, including general fund administration and accounting, supervision of and liaison with outside service providers, internal portfolio accounting, portfolio pricing, and internal transfer agent/shareholder account servicing. The nature of the investment advisory services provided the various Series of Federated Equity Funds, which covers only the service of overall portfolio investment management, is identical for each of these various Series of Federated Equity Funds.

58. The costs of employing portfolio managers and investment analysts, the costs of investment research, statistical data, and the costs and expenses of operating the physical plants serving the Series that comprise Federated Equity Funds, and the costs of other operational aspects of Federated Management's investment advisory services are supported by the gross investment advisory fees charged all similarly situated "brother/sister" Series or portfolios of Federated Equity Funds, including Federated Kaufmann Fund. The Federated Disclosure Materials indicate that the investment objectives of all of these Series are capital appreciation or capital growth. While the separate investment philosophies or strategies and the individual portfolio managers of the several Series may differ, the methods, functions and services used in selecting equity investments for all portfolios in the Series under their particular investment

philosophies or strategies are the same and such investment advisory and investment research services and functions are supported by the aggregate fees collected from all "brother/sister" Series or portfolios of Federated Equity Funds, including Federated Kaufmann Fund. Moreover, the principal operating officers of FEMCO, presently the primary investment adviser to Federated Kaufmann Fund, FGIMCO, currently the sub-adviser, and while it served as primary investment adviser to Federated Kaufmann, FIMCO, are or were the same. Thus, Keith Morgan Schappert has been President and CEO of all three of these investment advisers, and Stephen Frank Auth has been the Executive Vice President – CIO (Chief Investment Officer)–Equity of both FEMCO and FGIMCO, and previously held the same position with FIMCO while it served as primary investment adviser to equity mutual funds.

59. On information and belief and because of Federated Kaufmann Fund's large size, the investment advisory fee of 1.425% of assets paid by Federated Kaufmann Fund, make this Fund the most profitable of all mutual funds that are a part of Federated Equity Funds. In spite of the  equivalence of the nature of the investment advisory functions and services that Federated Management provides Federated Kaufmann Fund and the other "brother/sister" Series that are a part of Federated Equity Funds, and the commonality and sharing of the same operational support personnel, the investment advisory fee of 1.425% of assets that Federated Management charges Federated Kaufmann Fund is unreasonably higher than the investment advisory fees calculated at the rate of 0.75% of assets that Federated Management, FIMCO and/or FEMCO charge similarly situated "brother/sister" Series that are part of the same umbrella entity, that have the same basic investment objectives of capital appreciation or capital growth, that are overseen by the same Board of Trustees, that receive the same type of investment advisory services, and that are served by the same operational support staff.

Accordingly, the investment advisory fee of 1.425% is not commensurate with the services provided Federated Kaufmann Fund when compared with the nature of the same services provided other "brother/sister" mutual funds for the substantially lesser investment advisory fee of 0.75%.

60. Per the Federated Disclosure Materials, the investment advisory fee of 1.425% of assets charged Federated Kaufmann Fund is, as a percentage of assets, one of the highest if not the highest investment advisory fee that Federated Management charges any other domestic equity mutual fund that it manages, except for the cloned Federated Kaufmann Fund Small-Cap Fund.  Moreover, because Federated Kaufmann Fund is the largest single equity mutual fund managed by Federated Management and has the highest investment advisory fee of any domestic equity mutual fund, the actual amount of investment advisory fees generated by Federated Kaufmann Fund after fee waivers for the years ended October 31, 2003, 2004, and 2005, amounting to $53,265,731, $81,991,326, and $96,344,877, respectively, are the largest single investment advisory fee that Federated Management received in each of those years from any other single domestic equity mutual fund  that it manages.

61. The investment advisory fee of 1.425% of assets charged Federated Kaufmann Fund is excessive and discriminatory, and is also significant and material. If the investment advisory fee charged Federated Kaufmann Fund were the same 0.75% of assets that Federated Management charges the other Series comprising Federated Equity Funds, the investment advisory fees generated by Federated Kaufmann Fund would have been reduced from $59,532,787 for 2003 to approximately $31.3 million, a difference of approximately $28.2 million, and an obviously significant savings amounting to approximately 0.68% of Fund assets or 68 basis points. Such a reduction should lower the total operating expense ratio for the Class

K Shareholders of Federated Kaufmann Fund below the voluntary 1.95% Operating Expense Cap level assiduously maintained by Federated Management and would enable Federated Kaufmann Fund's Class K Shareholders to participate in economies of scale then made possible by Federated Kaufmann Fund's significantly larger size and its continuing increase in assets over time.

62. FIMCO's and/or FEMCO's delegation of the "daily management" for investment advisory functions for Federated Kaufmann Fund to FGIMC, the affiliated sub-adviser, for a sub-investment advisory fee of 1.175% of assets per annum is, in effect an admission that an investment advisory fee of 1.425% of assets per annum is excessive.  As previously alleged in Par. 24, herein, the term "daily management" of the Fund's assets is a  phrase substantially similar to the phrase "day to day investment operations" used in the disclosure materials for Old Kaufmann before its acquisition by Federated Management to include all investment management and investment research operations, and would seem to have the same meaning. If the total investment advisory fees charged Federated Kaufmann Fund were to be reduced to the level of 1.175% per annum on the assumption that this fee is sufficient to cover all "day to day investment operations" (the phrase used by Old Kaufmann to mean all investment management and research operations), the amount received by FGIMC, the affiliated sub-adviser to which the "daily management" of investment functions has been delegated, the total investment advisory fees payable by Federated Kaufmann Fund would have been approximately $49 million for 2003 rather than the $59.5 million actually generated before application of the partial fee waiver. An investment advisory fee of 1.175% is still an excessive and discriminatory fee in comparison with the 0.75% investment advisory fees Federated Management charges other equity mutual fund Series of Federated Equity Funds that are receiving comparable investment

advisory services of the same nature and quality.

63. The sub-investment advisory fee of 1.175% that FGIMCO receives as a sub-adviser for Federated Kaufmann Fund is excessive and discriminatory when compared with the sub-advisory fees that FGIMCO charges with respect to other similarly situated equity mutual funds. With respect to Federated Large-Cap Growth Fund, also a Series of Federated Equity Funds, FGIMCO receives a sub-advisory fee of only 0.4875% of assets per annum, where that fund's primary investment advisory fee is only 0.75% of assets per annum. In addition, the pre-existing Federated Kaufmann Small-Cap Fund that had been a Series of Federated Equity Funds before it was merged into Federated Kaufmann Fund to facilitate the creation of a new Federated Kaufmann Small-Cap Fund with a higher fee schedule, paid an investment advisory fee of 0.75%, and FGIMCO charged a sub-advisory fee of only 0.15% of assets per annum during that period.  These variances in fees for substantially the same investment sub-advisory services performed by FGIMCO, ranging from 0.15% to 1.175% for Federated Kaufmann Fund, also constitute the charging of an excessive investment advisory fee and a form of discrimination against the Class K Shares of Federated Kaufmann Fund that constitutes a breach of fiduciary duty.

**Legal Tests For Determination of the Fairness of Investment Advisory Fees Upon Annual Renewal of Investment Advisory Agreements**

64. The central test for determining whether compensation charged investment companies by affiliated service providers violates Sec. 36(b) was discussed in a series of significant cases decided in the 1980's and early 1990's. The seminal case is *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982). Under *Gartenberg,* the test is "essentially whether the fee schedule represents a charge within the range of what

would have been negotiated at arm's-length in the light of all of the surrounding circumstances." In order to violate Sec. 36(b), "the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Id at pages 928-929.

65. In applying this central test, a wide spectrum of pertinent facts must be weighed in determining whether a fee or other compensation is excessive and accordingly violates Sec. 36(b). The decision in *Gartenberg,* followed by courts in other decisions, specifically identified six factors to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered. These factors include but are not limited to: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the investment adviser or manager; (3) economies of scale; (4) comparative fee structures; (5) fallout benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the funds); and (6) the care and conscientiousness of the directors in performing their oversight function. The factors set forth in the *Gartenberg* line of cases are discussed in more detail in Paragraphs 66 through 79. It is not necessary that a plaintiff establish that an investment organization is in non-compliance with all six factors in order for there to be a finding that the investment management organization breached its fiduciary duty to a managed mutual fund. And as admitted by Federated Management and discussed in Paragraphs 42-44 of this Complaint, incorporated herein, not all of these factors are even considered in the Federated Trustees deliberations on annual contract renewals. Instead, the Federated Trustees considers the "totality" of circumstances surrounding numerous mutual funds in renewing a particular mutual fund's contract renewal and its relationships with other mutual funds in similar situations in the aggregate and do not review a particular mutual fund as though it is the only mutual fund

managed by Federated Management.

66. <u>The Nature and Quality of the Services Rendered.</u> As alleged in Paragraphs 57 and 58, Federated Management provides the same nature of investment advisory services to all Series of Federated Equity Funds. Using the 12-month period ended October 31, 2003 as an example, the portfolios of the five Series of Federated Equity Funds having investment advisory fees of 0.75% of assets per annum had combined assets of approximately $4.9 billion and had in excess of 350 separate companies in the aggregate in their five separate portfolios.  These five portfolios have been overseen by ten primary portfolio managers, two for each fund. The aggregate investment advisory fees for these five Series for the 12- month period ended October 31, 2003 were approximately $29,510,354.

67. Federated Kaufmann Fund considered separately has approximately $5.8 billion in assets and approximately 225 separate companies in its single portfolio, and this single portfolio is overseen by four primary portfolio managers, two of whom are shared with Federated Kaufmann Small-Cap Fund. Yet this <u>single </u>mutual fund generated $53,265,731 in investment advisory fees after fee waivers under the voluntary 1.95% Expense Limitation Cap for the same twelve month period ended October 31, 2003.

68. The fee discrimination is apparent. Federated Management is operating five separate and distinct, smaller portfolios with separate portfolio accounting and financial statements and containing far more portfolio securities in the aggregate, using ten primary portfolio managers and providing the same nature of investment advisory services for a combined $29.5 million in investment advisory fees, all calculated at 0.75% per annum. But in 2003, it charged the much larger, Federated Kaufmann Fund that has only one set of portfolio accounting and financial statements and has fewer companies in its portfolio than the five separate funds in the aggregate,

and has only four primary portfolio managers, two of whom are shared with Federated Kaufmann Small-Cap Fund, the substantially larger investment advisory fee of $59,532,296 before voluntary fee waivers, calculated at 1.425% of assets per annum and reduced to $53,265,731 after fee waivers, for providing the same nature of investment advisory services. The investment management operations of five separate, smaller mutual funds with five separate portfolios and five separate sets of financial statements are inherently more complex and expensive than the investment management operations of a single, much larger mutual fund with only one portfolio of securities and one set of accounting and financial statements. Such substantial pricing discrimination cannot be justified on the theory that the quality of investment advisory services is better by arguing that Federated Kaufmann Fund has experienced better investment performance.

69. The Federated Disclosure Materials show the investment performance records of the Series comprising Federated Equity Funds, beginning in 2001 when Federated Kaufmann Fund was first acquired, to be as follows:

### Comparative Investment Performance-Class A Shares

| Name of Fund | 12 Months Ended October 31 | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| Federated Capital Appreciation | 5.22% | 6.97% | 16.89% | (13.10)% | (17.25)% |
| Federated Growth Strategies | 16.07% | 9.15% | 32.18% | (18.51)% | (39.31)% |
| Federated Large Cap Growth | 7.54% | 2.58% | 13.91% | (18.62)% | (40.54)% |
| Federated Market Opportunity | 3.89% | 12.29% | 19.09% | 0.56  % | 15.67% |
| **Federated Kaufmann  Fund** | **14.25%** | **5.24%** | **38.42%** | **( 8.90)%** | **( 2.31)%** |
| Federated Kaufmann Small-Cap | 12.79% | 14.22% | 70.70% | --- | --- |
| Federated Technology | 2.72% | 2. 02% | 48.95% | (30.04%) | (67.95)% |

70. From these statistics, it is apparent that Federated Kaufmann performed well in all five years, but it was never the best performer in any of those years among the seven 'brother/sister" funds. These statistics demonstrate the fallacy of justifying Federated Kaufmann

Fund's particular, excessively high investment advisory fee of 1.425% against the 0.75% fee of other "brother-sister" funds (with at least one fund having the lower fee performing better in every period) through emphasizing good investment performance in isolation. Investment performance varies in different periods, depending on investment objectives, composition of the portfolio, and the relationship of the contents of the portfolio to movements in the stock market as a whole and to general economic conditions. When all of the mutual funds in a comparable or related group perform relatively well, an excessively high investment advisory fee for one mutual fund cannot be justified by reference to good performance for that particular fund in some periods, or by considering that fund's fee separately or in a vacuum without reference to similarly situated mutual funds.  The commonality or similarity of the nature and quality of the investment advisory services provided Federated Kaufmann Fund in comparison with the same services provided other "brother/sister" Series of Federated Equity Funds has not been given adequate consideration by the Federated Trustees in determining or approving its much higher investment advisory fee as compared with the lower fees charged the other brother-sister funds.

71. <u>The Profitability of the Funds to the Investment Adviser or Manager</u>. As alleged in Par. 44, Federated Kaufmann Fund is, because of its large size, capable of generating the greatest economies of scale of any other equity mutual fund managed by Federated Management, FIMCO, and/or FEMCO. Yet Federated Kaufmann Fund pays the highest investment advisory fee in both absolute and relative terms of any other Series in Federated Equity Funds and, additionally, of any other domestic equity mutual fund managed by Federated Management, FIMCO, and/or FEMCO. Because of its large size, high fee schedule, and the absence of any break-points in any of its fees as assets grow, coupled with its servicing by exactly the same servicing entities as other Series of Federated Equity Funds using the same cost structures, it is

the most profitable domestic equity Series of Federated Equity Funds, the umbrella entity, and additionally in the entire spectrum of domestic equity mutual funds managed by Federated Management. After application of the "voluntary" 1.95% Expense Operating Cap, resulting in an investment advisory fee waiver of $6,266,565 for the fiscal year ended October 31, 2003, the net investment advisory fee paid by Federated Kaufmann Fund of $53,265,731 for that year amounted to approximately 1.27% of assets.  Even viewed in this context, such a fee level is one of the highest if not the highest investment advisory fee paid by any other domestic equity mutual fund managed by Federated Management. The total of the annual service fees charged and received by Federated Management from Federated Kaufmann Fund, include the investment advisory fee of 1.425%, the fund administration fee of approximately 0.075%, the 12b-1 Distribution Fee that can be as much as 0.50%, the Shareholder Services Fee that can be as much as 0.25%, and the transfer agency fee that can range between 0.12% to 0.17%. When combined with other expenses, total expenses can be as much as 2.40%.in the absence of the "voluntary" 1.95% Expense Limitation Cap. As an example, for the fiscal year ended October 31, 2003, the Fund's expense ratio, which includes all operating expenses, was approximately 2.46% before "voluntary" fee waivers reduced expenses to 1.95%. Because of its large size and the absence of any fee breakpoints with respect to any of its percentage of asset fees at higher levels of assets, Federated Kaufmann Fund is the most profitable equity mutual fund of all of the Series that comprise Federated Equity Funds, even after application of the voluntary 1.95% Expense Limitation Cap, and additionally Federated Kaufmann Fund is the most profitable equity mutual fund in the Federated Mutual Fund Complex. This degree of profitability through the charging of excessive fees has not been adequately considered by the Federated Trustees.

72. Economies of Scale.  Investment management organizations can realize economies of

scale from increased assets within a particular mutual fund and from increased total assets in all mutual funds under management. These economies of scale are created for the management organization through the abilities of a portfolio management staff and an administration and operations staff to manage increasing assets, increasing numbers of mutual funds, and increasing numbers of shareholder accounts through a staff that does not need to increase proportionately or as rapidly as the increases in assets, numbers of funds, and numbers of shareholder accounts. These economies of scale can be passed on to and shared with the mutual funds as assets increase if fee breakpoints are installed at higher asset levels for mutual fund fees that are calculated as percentages of assets, or if lower asset based investment advisory fees are adopted by the management company in response to increases in the overall level of assets under management. Mutual funds can also realize economies of scale by the fact that relatively fixed mutual fund operating expenses paid by the funds to third parties, such as the fees and expenses of independent accountants, outside lawyers, the independent custodian, insurance premiums, trade association dues, typesetting and printing expenses and other similar types of relatively fixed fees and expenses do not increase proportionately or as rapidly as increases in assets and the number of shareholders.

73. When increases in assets under management occur, generating the ability to realize such economies of scale, the opinions in the *Gartenberg* line of cases indicate  that the ability by an investment management organization or one or more mutual funds to generate material economies of scale is a significant factor in determining whether the investment management organization has a fiduciary duty under Sec. 36(b) of the Investment Company Act to share these increased economies of scale with the mutual funds that generate such increased economies of scale. The mutual funds involved in the *Gartenberg* line of cases had fee breakpoints at various

levels of assets as assets rose, and the existence of these fee breakpoints was recognized by the courts as a significant factor resulting in the sharing of economies of scale that justified the various fees at issue in these cases. Yet the excessively high investment advisory and overall fee structure imposed on Federated Kaufmann Fund without any fee breakpoints prevents this Fund from realizing any economies of scale generated by its large size. The degree of economies of scale that could be generated by and then extended to Federated Kaufmann Fund through a different fee structure has not been adequately considered by the Federated Trustees.

74.  Comparative Fee Structures.  The *Gartenberg* line of cases placed little value on the argument that a mutual fund investment advisory fee could be justified by showing that the particular mutual fund whose fee is being challenged has a fee that is within the general range of the fees of other, "outside", non-affiliated mutual funds managed by other investment advisers. However, in the Annual Report to Shareholders for the fiscal year ended October 31, 2005, applicable to the Class K Shares of Federated Kaufmann Fund, Federated Management makes the following statement with respect to the comparison of investment advisory fees of the various Federated Funds, including specifically Federated Kaufmann Fund, with those of outside or non-affiliated funds:

> " … As suggested above, the Board considers the information it receives about the Fund's performance and expenses as compared to an appropriate set of similar competing funds to be more relevant."  See Exhibit C.

A comparison of the 1.425% investment advisory fee of Federated Kaufmann Fund with "outside", competing is particularly unavailing. ***Morningstar, Inc.,*** the preeminent mutual fund rating organization, issued a research analyst's report on June 14, 2004, attached as Exhibit F, which indicates that Federated Kaufmann Fund's s overall fee schedule is out-of-line with that of other non-affiliated mutual funds, stating:

- *"Federated Kaufmann's history of disregard for shareholders makes it one to avoid"*

- *" … The 1.95% levy for the fund's closed, no-load Class K shares … is topped by only a handful of its mid-growth peers, all of which are a fraction of this one's size."*

- *"The expense ratio for the successful Kaufmann Fund remains outrageously high .."*

75. The *Gartenberg* line of cases does not foreclose a fee comparison as between similarly situated mutual funds managed by the <u>same</u> investment adviser.  Paragraph 52 herein contains information demonstrating that the 1.425% investment advisory fee charged Federated Kaufmann Fund is also excessive and discriminatory in comparison with other similarly situated "brother-sister" mutual funds that are part of Federated Equity Funds, the umbrella entity that also includes Federated Kaufmann Fund. Such discrimination can, therefore, constitute grounds for establishing a breach of fiduciary duty by comparing one fund's substantially higher fees with the lower fees of <u>similarly situated</u> mutual funds managed by the <u>same</u> investment adviser where the nature and quality of the services provided all such funds are the same. The magnitude and lack of justification of this fee discrimination among similarly situated mutual funds as a breach of fiduciary duty has not been given adequate attention by the Federated Trustees.

76. <u>Fallout Benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the mutual fund).</u>  Federated Management serves the approximately 138 mutual funds in the Federated Fund Complex not only with investment advisory services for which it charges investment advisory fees, but also by providing these mutual funds with numerous other "in-house" operational services for which it charges the managed mutual fund additional service fees. Such fees include but are not limited to general administration fees, portfolio and fund accounting fees, fees for pricing services, distribution fees, transfer and dividend disbursing

43

agent fees, and shareholder accounting fees. Providing these additional services for Federated Kaufmann Fund and being able to charge these additional service fees would not be possible but for the acquisition by Federated Management of Old Kaufmann in 2001. Such additional miscellaneous service fees provide enormous overhead coverage and can be the basis of additional profits. The substantial extent of these additional fallout benefits to Federated Investors, Inc., derived from its management of Federated Kaufmann Fund as one of its equity mutual funds, is illustrated by the following statistics. Federated Equity Funds, the umbrella legal entity that includes Federated Kaufmann Fund as a Series, had approximately $10.9 billion in assets, including the assets of Federated Kaufmann Fund, at October 31, 2003, and accordingly Federated Equity Funds constituted approximately 48% of all equity mutual fund assets managed by Federated Investors, Inc. at that time. Within Federated Equity Funds, the additional miscellaneous fee revenues generated by Federated Kaufmann Fund's general administration fees, transfer and dividend disbursing agent fees, portfolio accounting fees, Rule 12b-1 Distribution Fees, and Shareholder Services Fees total approximately $40 million for the fiscal year ended October 31, 2003. These fees are in addition to the investment advisory fee revenues of $53,265,731 after fee waivers for 2003, indicating that Federated Kaufmann Fund generated between $90 million to $100 million in total fee revenues for Federated Investors, Inc. in 2003.

77. The same miscellaneous fee revenues in the aggregate generated by <u>all six of the other Series</u> within Federated Equity Funds were approximately $37 million for 2003. With the addition of investment advisory fees of approximately $29,515,354 from these mutual funds, total comparable fee revenues for the other six Series combined were approximately $66 million, significantly less than the $90 million to $100 million in total fee revenues generated by Federated Kaufmann Fund alone. In addition, with a relatively high portfolio turnover rate of

72% for the fiscal year ended October 31, 2003, Federated Kaufmann generated a large amount of portfolio securities purchases and sales and accompanying brokerage commissions, the total amount of which is not disclosed.  A portion of these brokerage transactions could have been used by Federated Management as compensation to be paid to  executing broker/dealers for research materials, in the manner authorized by Sec. 28(e) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78bb(e). According to the Federated Disclosure Materials, Federated Kaufmann Fund in 2003 directed $4,763,608,874 in portfolio securities purchases and sales to certain selected broker/dealers for execution of portfolio transactions and to obtain investment research services and paid $14,629,249 in brokerage commissions to such broker/dealers for the combined services of execution of portfolio transactions and receipt of such investment research services. As a result, Federated Kaufmann Fund provides substantial fallout benefits in the form of additional revenues and the ability to outside obtain investment research services through brokerage commissions that constitute fall-out benefits over and beyond the investment advisory fees paid to Federated Management and the ultimate parent, Federated Investors, Inc.

78. In determining appropriate and fair investment advisory fees to be charged Federated Kaufmann in comparison with the numerous other smaller equity funds within Federated Equity Funds, the umbrella entity and in the Federated Fund Complex that cannot generate comparable fall-out benefits, these substantial fallout benefits generated by Federated Kaufmann Fund have not been sufficiently considered by the Federated Trustees as qualifying Federated Kaufmann Fund for a lower, non-discriminatory investment advisory fee.

79. The Care and Conscientiousness of the Directors (Trustees) in Performing Their Oversight Function.. Periodic, essentially identical boilerplate discussions in the disclosure documents of numerous mutual funds in the Federated Fund Complex, including the disclosure

materials of Federated Kaufman Fund, have represented that Federated Management and the Federated Trustees who oversee Federated Kaufmann Fund have meticulously discussed and reviewed a large number of factors, generally the factors discussed in the _Gartenberg_ line of cases, in their required annual "in person" deliberations and discussions when the investment advisory agreements and other agreements have been renewed each year, in the manner required by Sec. 15 of the Investment Company Act, 15 USC Sec. 80a-15. See Exhibits C and G. But as indicated by the Federated Disclosure Documents, neither the Federated Trustees nor Federated Management has satisfied the principles set forth in the _Gartenberg_ line of cases that are applicable to the process necessary for the annual renewal of investment advisory agreements, and the investment advisory agreement involving Federated Kaufmann Fund therefore may not have been renewed in the manner contemplated by and pursuant to the requirements of Sec. 15 of the Investment Company Act, 15 USC 80a-15.  As previously alleged in Paragraphs 40 and 41, herein, there is insufficient time for and therefore insufficient serious, good faith, arms-length bargaining on the part of the Board of Trustees of Federated Equity Funds with Federated Management on this or any other fee issues specifically involving Federated Kaufmann Fund or its Class K Shareholders because of the limited amount of time available in board meetings for consideration of the routine, on-going operational issues together with the special issues on annual renewals involving the approximately 138 separate mutual funds in the Federated Fund Complex.  Moreover, Federated Management admits in the required description with respect to the factors considered in the annual contract renewals, as set forth in Federated Kaufmann's SAI and its latest Annual Report to Shareholders at October 31, 2005, that not all of these factors are considered with respect to each separate mutual fund, and that annual contract renewals for many mutual funds are reviewed in the aggregate rather than in a fund specific manner, in the manner

contemplated in the *Gartenberg* line of cases. See <u>Exhibits C and G,</u> that apply specifically to Federated Kaufmann Fund.

80. As alleged in Paragraph 71, Federated Kaufmann Fund constituted approximately 24% of all equity assets managed by FII in 2004, and its investment advisory fees constituted approximately 15% of total investment advisory fees received by FII from all sources, including fixed income and money market funds. Yet on information and belief, Federated Management has not provided the Federated Trustees with information about the reasons for the disparity in fees charged Federated Kaufmann Fund in comparison with the lower fees charged similarly situated "brother/sister" Series of the same umbrella entity, Federated Equity Funds, or that Federated Management provided descriptive and accurate information about the substantially greater profitability created for Federated Management by this disparity. In the absence of such disclosure, and on information and belief, Federated Management has not kept the Federated Trustees fully informed regarding the substantial profitability created by the excessive investment advisory fees charged Federated Kaufmann Fund in comparison with the lesser profitability created by the discrimination in charging lower investment advisory fees to other investment companies or mutual funds under common management, nor have the Federated Trustees demanded such information.

81. On information and belief, Federated Management has not seriously proposed methods of passing along economies of scale to Federated Kaufmann Fund. Instead, as previously alleged, Federated Management has used Federated Kaufmann Fund as a vehicle to raise investment advisory fees with respect to other mutual funds by merging such funds into Federated Kaufmann Fund without seeking additional economies of scale for Federated Kaufmann Fund through such mergers, and the Federated Trustees have allowed such mergers to

happen without requiring additional economies of scale. In addition, the Federated Trustees have wholly failed to seek other economies of scale through negotiating lower investment advisory fees as a percentage of assets or by implementing fee breakpoints at higher levels of assets. As a separate and additional breach of fiduciary duty, the Federated Trustees have essentially abdicated to Federated Management their fiduciary duties with respect to overseeing the reasonableness of the total fees and operating expense structure of Federated Kaufmann Fund by failing to negotiate a lower operating expense limitation cap that would be contractually binding. Instead, the Federated Trustees have allowed Federated Management to continue year after year with a "voluntary" 1.95% Expense Limitation Cap for Federated Kaufmann Fund that is higher than that applicable to other 'brother/sister" Series in Federated Equity Funds. This "voluntary" expense limitation cap can be voided at any time at Federated Management's sole discretion, and such cancellation would result in substantially higher expenses for Federated Kaufmann Fund. As a result, the Federated Trustees have not satisfied the test in the *Gartenberg* line of cases with respect to the requisite care and conscientiousness in performing their oversight functions.

82. The investment advisory fees and the entire fee structure imposed on Federated Kaufmann Fund by Federated Management, FIMCO and FEMCO was originally approved by the Board of Trustees of Federated Equity Funds (the "Federated Trustees") before the Federated Kaufmann Reorganization that merged Old Kaufmann into Federated Kaufmann Fund, and this fee structure has thereafter been presented for annual re-approval and renewal by the Federated Trustees. As previously alleged, the same Federated Trustees also oversee the other similarly situated "brother/sister" mutual funds that comprise Federated Equity Funds, and the same Federated Trustees also oversee essentially all other equity mutual funds and all other types of mutual funds that are managed by Federated Management and that comprise the

48

Federated Fund Complex. Because of this all encompassing involvement with all of the mutual funds in the Federated Fund Complex, all of the Federated Trustees therefore have constructive as well as actual knowledge of  the excessive and discriminatory fees that Federated Management, FIMCO and/or FIMCO have been and are imposing on Federated Kaufmann Fund by charging a higher investment advisory fee of 1.425%  in comparison with the more favorable fees of 0.75% of assets charged many other similarly situated equity mutual funds and equity accounts served by Federated Management, all of which have lesser assets and which are less capable of generating economies of scale.   But these Federated Trustees have failed to consider and take into account the invidious discrimination in approving and allowing Federated Management to charge such excessively high fees to Federated Kaufmann Fund and denying it the benefits of economies of scale while simultaneously and concurrently approving and allowing Federated Management to charge much lower fees to smaller "brother/sister" funds less capable of generating economies of scale.   As a result, Federated Management and the Federated Trustees have breached their fiduciary duties to Federated Kaufmann Fund by failing to propose or to negotiate a lower investment advisory fee that would extend economies of scale to the much larger Federated Kaufmann Fund while simultaneously approving and allowing Federated Management to charge  lower investment advisory fees and to extend significant economies of scale to other, smaller, similarly situated "brother/sister" mutual funds that are components of the same umbrella entity or to other equity mutual funds that otherwise are under their common management and oversight. Further, Federated Management and the Federated Trustees have used and allowed Federated Kaufmann Fund to be used as a vehicle to increase investment advisory fees applied to the assets of other mutual funds merged into Federated Kaufmann Fund, rather than considering how the assets of the merged funds could be used to

support additional economies of scale to Federated Kaufmann Fund, or to extend such economies of scale to Federated Kaufmann Fund.

83. The decisions in the *Gartenberg* line of cases do not foreclose the issue of considering investment advisory fees as being excessive for the services rendered based upon a comparison of investment advisory fees being charged similarly situated investment companies or mutual funds managed by the same investment advisory organization for rendering the same services where there are allegations and factual indications that the challenged fees create greater profitability for the investment advisory organization when compared with similarly situated investment companies or mutual funds receiving the same investment advisory services but paying lower investment advisory fees to the same investment advisory organization.

84. Other domestic equity investment companies or mutual funds managed by Federated Management with lesser assets that are incapable of generating the same economies of scale nevertheless pay lower investment advisory fees and because of their smaller size are less profitable to Federated Management. Federated Management, FIMCO, and/or FEMCO have breached their  fiduciary duties under Sec. 36(b) of the Investment Company Act by the failure to supply information to the Board of Trustees of Federated Equity Funds concerning the excessive and discriminatory fees being charged Federated Kaufmann Fund in comparison with other similarly situated investment companies or mutual funds, and the Board of Trustees of Federated Equity Funds has failed to request and consider such information in light of  the best interests of Federated Kaufmann Fund  and its shareholders, resulting in a failure both by Federated Management and the Federated Trustees to consider and extend economies of scale that are possible and that should be passed along in providing investment advisory functions

and other management services to Federated Kaufmann Fund, its largest and most profitable equity fund, in comparison with the economies of scale extended to smaller "brother/sister" mutual funds that are part of the same umbrella entity, and to other domestic equity investment companies or mutual funds.

85. The investment advisory fees charged Federated Kaufmann Fund by Federated Management, FIMCO, and/or FEMCO for providing equity investment advisory services are and continue to be disproportionate to the services rendered when considered in light of the accompanying higher profitability created for Federated Management in comparison with the lower investment advisory fees charged other smaller similarly situated "brother/sister" equity mutual funds and other similarly situated domestic equity investment companies or mutual funds for the same or comparable equity investment advisory services and the accompanying lesser profitability to Federated Management of such other investment companies or mutual funds.

86. Approval by the shareholders of Old Kaufmann of this excessive and discriminatory fee structure for Federated Kaufmann Fund in 2001 must be given little weight, because as alleged in Pars. 50 and 51 of this Complaint, shareholders of Old Kaufmann who were voting on the proposed reorganization were not provided with complete information about the blatant discrimination they would suffer in comparison with similarly situated mutual funds that were already a part of Federated Equity Funds and other mutual funds in the Federated Fund Complex. Nor can initial approval and subsequent re-adoption of this excessive and discriminatory fee schedule by the Federated Trustees on behalf of Federated Kaufmann Fund be given much weight in light of the limited amount of time available in formal meetings of the Board of Trustees for the Federated Trustees to consider, understand, discuss, and negotiate the

fee schedule imposed by Federated Management on Federated Kaufmann Fund or the Class K Shareholders. Also mitigating against giving annual Board renewals much weight is the admission in the Federated Disclosure Materials that the Board does not consider all of the *Gartenberg* factors at contract renewal time for each separate fund, does not look at each mutual fund individually, and instead considers the "totality" of a variety of circumstances and the relationships of other mutual funds in the Federated Fund Complex in the aggregate in re-approving investment advisory contracts.  See Exhibits C and G.

87. For all of these reasons, the investment advisory fee of 1.425% that Federated Management charges Federated Kaufmann Fund is so disproportionately large that it bears no reasonable relationship to the services provided and could not be within the range of what would have been negotiated by the Board of Trustees of Federated Equity Funds at arm's length in light of all the surrounding circumstances.

88. The Federated Disclosure Materials show that for the fiscal year ended October 31, 2003, the excessive and discriminatory investment advisory fee charged Federated Kaufmann Fund by Federated Management, FIMCO, and/or FEMCO, calculated at 1.425% of assets per annum, totaled $59,532,296 before voluntary fee waivers and $53,265,731 after voluntary fee waivers. If the investment advisory fee charged Federated Kaufmann Fund had been calculated on the basis of the investment advisory fees of 0.75% of assets per annum charged other similarly situated "brother/sister" mutual funds that comprise Federated Equity Funds and other equity funds managed by Federated Management, the investment advisory fee for Federated Kaufmann Fund would have approximated $31.3 million, a savings of approximately $28.2 million. On behalf of Federated Kaufmann Fund, Plaintiff seeks, pursuant to Sec. 36(b)(3) of the Investment Company Act, the "actual damages resulting from the breach of fiduciary duty" by

Federated Management, FIMCO and/or FEMCO in charging excessive and discriminatory investment advisory fees to Federated Kaufmann Fund  for the period of time allowed by statute.

## COUNT II

**AGAINST THE INVESTMENT ADVISER DEFENDANTS
DERIVATIVELY ON BEHALF OF FEDERATED KAUFMANN FUND
UNDER SECTION 215 OF THE INVESTMENT ADVISERS ACT OF 1940 FOR
VIOLATIONS OF SECTION 206 OF THE INVESTMENT ADVISERS ACT**

89. Plaintiff repeats and re-alleges allegation contained in Paragraphs 1 through 88, as if fully set forth herein.

90. This Count is based on Sec. 215 of the Investment Advisers Act of 1940 15 U.S.C. Sec. 80b-15 (the "Investment Advisers Act"), for violations of Section 206 of the Investment Advisers Act.

91. As alleged in Paragraphs 10, 11, and 12, Defendants Federated Equity Management Company of Pennsylvania ("FEMCO"), Federated Equity Management Company ("FIMCO"), and Federated Global Investment Management Company ("FGIMCO") each is an investment adviser registered with the U. S. Securities and Exchange Commission under the Investment Advisers Act (referred to collectively in this Count as the "Investment Adviser Defendants"). Any investment advisory contracts or agreements to which any of the Investment Adviser Defendants are parties are subject to the provisions of Sections 206 and Section 215 of the Investment Advisers Act, and the Investment Adviser Defendants are also subject to all other provisions of the Investment Advisers Act.

92. FEMCO has entered into an investment advisory contract or agreement with Federated Equity Funds to serve Federated Kaufmann as its primary investment adviser subsequent to December 31, 2003. FIMCO had entered into an investment advisory contract or

agreement with Federated Equity Funds to serve Federated Kaufmann as its primary investment adviser through December 31, 2003. FGIMCO had entered into investment sub-advisory contracts or agreements with FEMCO and FIMCO and/or Federated Equity Funds to serve Federated Kaufmann Fund as its sub-investment adviser during the periods that FEMCO and FIMCO were serving, respectively, as the primary investment advisers to Federated Kaufmann Fund.

93. As alleged in Paragraph 8, Federated Kaufmann Fund is a Series of Federated Equity Funds, which is registered with the SEC as an investment company pursuant to the provisions of the Investment Company Act.   Accordingly, any investment advisory or sub-advisory agreements or contracts to which the Investment Adviser Defendants are parties to provide services to Federated Kaufmann Fund are subject to the provisions of Section 15 of the Investment Company Act. Sections 15(b) and 15(c) of the Investment Company Act require *inter alia* that any investment advisory contract or agreement, including any sub-advisory contracts or agreements, can continue in effect for more than two years only if renewed annually, and the initial adoption and subsequent renewals must be approved by a majority of the non-interested or independent directors.   Under Section 15(c), the investment adviser has a duty to furnish such information as may reasonably be necessary to evaluate the terms of any contract under which the registered investment adviser undertakes to serve as investment adviser for the registered investment company. In addition,  Section 15(c) also states that " (i)t shall be unlawful for the directors of a registered investment company, in connection with their evaluation of the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company, to take into account the purchase price or other consideration any person may have paid in connection with a transaction of the type referred to in paragraph (1), (3), or (4) of

subsection (f)" , which relates to the acquisition or assumption of  an investment advisory contract.

94. In connection with the Federated Kaufmann Reorganization that took place on or about April 1, 2001 and subsequently thereto, the Investment Adviser Defendants have entered into and/or renewed the investment advisory and investment sub-advisory contracts or agreements with or on behalf of Federated Kaufmann fund on several different occasions.

95. Pursuant to the provisions of Sec. 15 (c) of the Investment Company Act, the Investment Adviser Defendants, in connection with the required  annual renewals of the Investment Advisory Agreements have a duty (1) to disseminate to the independent or non-interested  members of the Board of Trustees of Federated Equity Funds, of which Federated Kaufmann is a Series, complete, accurate, and truthful information with respect to the fairness, costs, and profitability of  the  fees charged for investment advisory services provided on behalf of Federated Kaufmann Fund as a separate Series or mutual fund under the applicable investment advisory agreements and (2) to fairly and truthfully administer their fiduciary responsibilities in the performance of their investment advisory services under their investment advisory contracts with or on behalf of Federated Kaufmann Fund as a separate Series or mutual fund in accordance with their fiduciary duties under the Investment Advisers Act and the Investment Company Act.

96. On information and belief, and as set forth in more detail in Exhibit C, the Investment Adviser Defendants breached their fiduciary duties to Federated Kaufmann under Section 36(b) of the Investment Company Act and/or Section 206 of the Investment Advisers Act by engaging in transactions, practices, or a course of business as described throughout this Complaint that operate and have operated as a fraud or deceit upon Federated Kaufmann Fund as a Series of

Federated Equity Funds, or that operate and have operated as a fraud and deceit upon the non-interested or independent members of the Board of Trustees of Federated Equity Funds through their failure to provide full and complete information to the non-interested or independent members of the said Board of Trustees with respect to the excessive and discriminatory nature and relative amounts of the fees and expenses charged Federated Kaufmann Fund as a separate Series or mutual fund and/or its Class K Shareholders as a separate class in comparison with the same types fees and expenses charged other classes of shares of Federated Kaufmann and/or the other "brother-sister" Series of Federated Kaufmann that are Series of Federated Equity Funds. They have also failed to provide a full and reasonable rationale for justifying the continuation of such excessive and discriminatory fees and expenses with respect to Federated Kaufmann Fund and/or its Class K Shareholders that is not predicated on the costs of acquisition of the investment advisory or investment sub-advisory agreements applicable to Federated Kaufmann Fund in connection with the renewal or continuation of such excessive and discriminatory fees and expenses.

97. The Investment Adviser Defendants breached their fiduciary duties to Federated Kaufmann Fund under Section 36(b) of the Investment Company Act and/or Section 206 of the Investment Advisers Act by engaging in transactions, practices, or a course of business as described in Paragraphs 1 through 88, and Paragraphs 106 through 147, incorporated herein, that operate and have operated as a fraud or deceit upon Federated Kaufmann Fund as a Series of Federated Equity Funds, or that operate and have operated as a fraud and deceit upon the Class K Shareholders of Federated Kaufmann Fund in the performance of the respective investment advisory and investment sub-advisory contracts and agreements through the charging and receipt of excessive and discriminatory fees in comparison with similar fees applicable to other

"brother-sister" funds of Federated Kaufmann Fund that are Series of Federated Equity Funds. The excessive and discriminatory fees charged include investment advisory fees, redemption fees applicable to Class K Shareholders that increased the amount of investment advisory fees retained by the Investment Advisory Defendants, and/or the charging and receipt of excessive and discriminatory Shareholder Service Fees for or on behalf of affiliates that were controlled by or under common control of the Investment Adviser Defendants.

98. As fiduciaries pursuant to the Investment Advisers Act and the Investment Company Act, the Investment Adviser Defendants are and were required to serve Federated Kaufmann Fund in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act and Section 36(b) of the Investment Company Act. As a result of the Investment Adviser Defendants multiple breaches of their fiduciary duties owed to Federated Kaufmann Fund and its Class K Shareholders, Federated Kaufmann Fund and/or its Class K Shareholders have been damaged.

99. By letter dated September 17, 2004, Plaintiff's attorneys sent by Certified Mail, return receipt requested, a demand pursuant to Rule 23.1 of the Federal Rules of Civil Procedure to all of the members of the Board of Trustees of Federated Equity Funds, requesting that the Board of Trustees take action to redress the charging of the excessive and discriminatory fees and expenses being assessed against Federated Kaufmann Fund and/or its Class K Shareholders, as set forth in the Original Complaint filed in this action on June 25, 2004. Subsequently, by letter dated December 6, 2004, a copy of the Amended Complaint filed on November 12, 2004 was provided independent counsel for the Board of Trustees of Federated Equity Funds and Federated Kaufmann Fund for consideration of the Rule 23.1 Demand. The September 17, 2004 letter and the December 6, 2004 letter are collectively referred to hereafter as the "Rule 23.1

Demand Letters". The collective correspondence with respect to this Rule 23.1 Demand is attached as Exhibit H.

100. The mechanism sought by Plaintiff through her attorneys for redress under the Rule 23.1 Demand Letters was institution of an action against the Federated Management Organization under Section 36(a) of the Investment Company Act, seeking redress for the matters described in the Original Complaint and the Amended Complaint. At the time the Rule 23.1 Demand Letters were written, there were certain decisions by courts within the Third Federal Judicial Circuit that indicated that courts in the Third Circuit recognized the existence of an implied, private cause of action under Section 36(a).

101. By letter dated December 15, 2004, signed by John E. Murray, Jr., a trustee of Federated Equity Funds (the "Rejection Letter"), the demand for redress under the Rule 23.1 Demand Letters was rejected. The Rejection Letter stated that "…. the Board's nine independent trustees, who constituted a quorum, voted unanimously to reject the Demand as not being in the best interests of the Federated Kaufmann Fund or Federated Equity Funds and because the ICA Section 36(a) does not provide a private remedy for the payment of excessive fees."

102. Subsequent to receipt of the first Demand Letter dated September 17, 2004, the Investment Adviser Defendants have sought renewal on one or more occasions of the investment advisory contracts or agreements to which they are parties, which agreements applied to Federated Kaufmann Fund, without any reduction in the fees and charges assessed against Federated Kaufmann Fund  and/or its Class K Shareholders, and the Board of Trustees of Federated Equity Funds has renewed these contracts or agreements without any reduction in the fees and charges assessed against Federated Kaufmann Fund and/or its Class K Shareholders.

103.   Subsequent to receipt of the Rule 23.1 Demand Letters the Board of Trustees of Federated Equity Funds, of which Federated Kaufmann is a Series, has not instituted any legal action against the Investment Adviser Defendants or their affiliates in the Federated Management Organization for redress of the matters discussed in the Original Complaint and/or the Amended Complaint, nor has the Board of Trustees instituted any action under any other provision of the Investment Company Act or the Investment Advisers Act against the Federated Management Organization.

104.   The Rule 23.1 Demand Letters on the part of this Plaintiff and the Rejection Letter, as contained in Exhibit H constitute sufficient demand upon and rejection by the Board of Trustees of Federated Equity Funds, of which Federated Kaufmann Fund is a Series, to justify a private, derivative cause of a action by this Plaintiff under Sections 215 and 206 of the Investment Advisers Act. In the alternative, the Rule 23.1 Demand Letters on the part of this Plaintiff and the Rejection Letter, as contained in Exhibit H, coupled with the lack of action by the Board of Trustees of Federated Equity Funds to institute any type of litigation against the Investment Adviser Defendants and the Federated Management Organization, or to negotiate any changes in the applicable fees and expenses assessed against Federated Kaufmann, demonstrate the futility of making an additional demand under Rule 23.1 that refers specifically to a cause of action under Section 215 and 206 of the Investment Adviser Act.

105. For the aforementioned reasons, pursuant to the provisions of Section 215 of the Investment Advisers Act, Federated Kaufmann Fund is entitled to rescind its investment advisory and investment sub-advisory agreements with the Investment Adviser Defendants with respect to Federated Kaufmann Fund that were renewed during the period of time covered by this proceeding and, in particular, any such contracts or agreements that were renewed after

59

receipt by the trustees of Federated Equity Funds of the first Rule 23.1 Demand Letter dated September 17, 2004, and to recover on behalf of Federated Kaufmann Fund all fees, expenses, and charges paid by Federated Kaufmann Fund to the Investment Advisor Defendants in connection with or related to these rescinded investment advisory and investment sub-advisory contracts or agreements for the period of time allowed by statute.  The amounts of the investment adviser fees received by the Investment Adviser Defendants for the fiscal years ended October 31, 2003, 2004, and 2005 are set forth in Par. 52, and total approximately $363,618,020.

**COUNT  III**

**INVESTMENT COMPANY ACT Sec. 36(b)**
**BREACH OF FIDUCIARY DUTY**
**Receipt of Excessive and Discriminatory Redemption Fees Charged To**
**Federated Kaufmann Fund Class K Shareholders**

106. Plaintiff repeats and re-alleges paragraphs 1 through 105, inclusive, of this Complaint.

107. Old Kaufmann Fund or Edgemont charged all of Old Kaufmann's shareholders a redemption fee of 0.20% or 20 basis points on the value of shares redeemed, purportedly to cover the costs of processing redemptions. See <u>Exhibit I.</u>  That redemption fee was perpetual, was never eliminated, and never expired, regardless of the length of time shares were held. There is no indication in the disclosure documents of Old Kaufmann that Edgemont granted any waivers with respect to this redemption fee, and it appears that all redeeming shareholders without exception were charged the redemption fee.

108. Old Kaufmann's Disclosure Materials do not reveal whether the fee was withheld from the redeeming shareholders' redemption proceeds by the Fund, which then remitted the fee to Edgemont or the transfer agent, or whether Edgemont or the transfer agent withheld the fee

after a redemption had been taken and the shareholder's redemption proceeds had been removed from the Fund. No specific information was given as to the application of the fee to particular expenses, or how the gross fees collected were used for the benefit of Old Kaufmann or its remaining, non-redeeming shareholders.

109. Even for the stated purpose of covering redemption expenses, the redemption fee charged Old Kaufmann shareholders who redeemed was manifestly excessive, and such excessiveness was conceded by Edgemont through its practice of routinely "returning" to the Fund a relatively large percentage of the gross redemption fees it had collected from redeeming shareholders. For example, for the fiscal year ended December 31, 1999, the last fiscal year for which audited financial statements were available prior to issuance of the Proxy Statement for the Federated Kaufmann Reorganization, redemption fees of $1,634,869 were allocated to cover the costs of redemption, but "excess fee proceeds" of $2,181,913 were added to Fund assets. See Exhibit J. No amounts were returned to redeeming shareholders from whose gross redemption proceeds the redemption fees had been taken.

110. When Federated Kaufmann Fund acquired Old Kaufmann's assets, a similar 20 basis point redemption fee (the "Class K Redemption Fee") was made applicable to the new Class K Shares that were issued to Old Kaufmann's only class of shareholders and who constituted 100% of Federated Kaufmann Fund's shareholders at its inception in April of 2001. The Federated Disclosure Materials state that the purpose of the Class K Redemption Fee is to encourage long-term investment, to cover the costs of redemptions, and to facilitate portfolio management. See Exhibit K.

111. Federated Management has chosen to waive the Class K Redemption Fee in favor of and for the benefit of certain types of employer sponsored employee benefit plans, including

"401(k)" plans that hold Federated Kaufmann Fund Class K shares. See Exhibit K. In many employer sponsored employee-benefit plans, including "401(k) plans", the plan itself or plan participants are given the privilege of daily movement in and out separate plan investments, and many such plans or plan participants actively take advantage of this daily exchange privilege.

112. The effect of a waiver of the Class K Redemption Fee for the favored employer sponsored employee plan participants while applying this same redemption fee to other Class K Shareholders is to eliminate the Class K Redemption Fee for the types of Class K shareholders most likely to engage in repetitive trading, the employer plans themselves or the individual plan participants, while enforcing the Class K Redemption Fee against the types of Class K Shareholders least likely to engage in repetitive trading, those individual investors who have been long-term shareholders. This practice contravenes all three of the stated purposes of the Class K Redemption Fee as set forth in the Federated Disclosure Materials. Because the fee is no longer charged uniformly, without exception, to all redeeming Class K Shareholders, the favored Class K Shareholder participants in the employer sponsored employee benefit plans are being given a perpetual financial benefit that is not available to other redeeming, non-favored Class K Shareholders, and the costs of this financial benefit are being covered either by the other redeeming Class K Shareholders and/or by the Fund itself through transfer agent charges applicable to the Class K Shares.

113. This waiver of the Class K Redemption Fee for a particular set of shareholders within the same Class that is more likely to engage in repetitive trading while applying the redemption  fee to others within the same Class who are less likely to engage in repetitive trading is a form of  discrimination that is not related to cost savings and encourages repetitive trading on the part of  the exempted shareholders with an accompanying increase in expenses to the

Fund. Such a practice violates the provisions of Investment Company Act Rule 11a-3, 17 CFR Sec. 270.11a-3, to the extent that it may be applicable, which governs exchange offers and requires that any redemption fee be applied uniformly to all shareholders of the class against which it is assessed unless the schedule variation is reasonably related to the costs to the fund of processing the type of redemptions for which the fee is charged.

114.   Application of an excessive, discriminatory charge in the manner previously described creates a senior security in contravention of Sec. 18(f)(1)of the Investment Company Act, 15 USC Sec. 80a-18(f)(1) through its disparate application by creating a preferred or senior set of shareholders within a single class of shares who receive the full net asset values of their shares upon redemption or exchange while others do not, and also because it prefers the shareholders of Classes A, B, and C of Federated Kaufmann Fund who do not pay a similar redemption fee and who receive the full net asset values of their shares upon redemption over the Class K Shareholders of Federated Kaufmann Fund who must pay the Class K Redemption Fee and who do not receive the full net asset values of their shares upon redemption.

115.   Federated Management has merged certain other, smaller funds into Federated Kaufmann Fund, but the shareholders of these merged funds have received Class A shares in exchange for their shares. Such Class A shares are not subject to a redemption fee.  Exempting these shareholders, who became shareholders in mergers similar to Federated Kaufmann Fund's Class K Shareholders, from the Class K Redemption Fee is an additional act of discrimination against Federated Kaufmann Fund Class K Shareholders. Federated Management has also created several additional classes of "Class K" shares (other partially closed classes or classes offered to a limited set of investors) in other mutual funds in the Federated Fund Complex, but

did not saddle these new classes with perpetual redemption fees similar to the Class K Redemption Fee.

116. The individual and the non-employer sponsored benefit plan Class K Shareholders of Federated Kaufmann Fund remain the only set of shareholders in the entire Federated Fund Complex that are subject to a perpetual redemption fee taken from their redemption proceeds. The following example illustrates the effects of the Class K Redemption Fee. A Class K Shareholder redeeming $10,000 is charged $20. At the same time, a Class K Shareholder redeeming $1,000,000 in a single transaction is charged $2,000 for a single redemption. There is no cap on the total redemption fee for larger redemptions. Yet there is no cognizable difference in the costs of processing a $10,000 redemption and processing a $1,000,000 redemption, assuming the Fund has adequate cash available. The Federated Disclosure Materials indicate that Federated Kaufmann Fund has had cash equivalent reserves of 5% or more of its $3 billion to $5 billion in assets at the end of several semi-annual reporting periods, indicating that there is generally more than sufficient cash available for redemptions in the absence of a "run" of redemptions. For example, at October 31, 2003, cash equivalents approximated $1.5 billion, more than 30% of the total portfolio of $5.8 billion. With respect to multiple redemptions, a shareholder redeeming $1,000,000 over a ten year period in 120 monthly installments, resulting in the processing of 120 different transactions, pays the same aggregate $2,000 redemption fee over time in 120 different monthly payments as is paid by the shareholder redeeming $1,000,000 in a single transaction, even though the expenses of processing 120 separate transactions greatly exceed the expenses of processing a single transaction. As a result of these facts, the 0.20% (20 basis point) Class K Redemption Fee charged to redeeming Class K Shareholders is not reasonably related to the costs of the services provided.

117. The Class K Redemption Fee is material to the Class K shareholders. To place this 20 basis point redemption fee in perspective, the Federated Disclosure Materials indicate that the "transfer and dividend disbursing agent" fees charged by FSSC, the FII affiliate that has served through mid-2004 as the transfer agent for Federated Kaufmann Fund Class K Shareholders (or its immediate parent, FSC), as compensation for all account transactional records for an entire year, amounts to less than 20 basis points on total Class K assets. For example, for the fiscal year ended October 31, 2003, the total amount charged under the "transfer and dividend disbursing agent" fees by the transfer agent for all account maintenance functions for the entire year amounted to $4,981,654 or approximately 0.143% (14.3 basis points) of year-end Class K assets of $3,494,764,714. This expense is paid by Federated Kaufmann Fund on behalf of all Class K Shareholders. Thus, a redeeming Class K Shareholder making a full redemption is being charged individually a fee of 0.20% (20 basis points) on redemption proceeds that is greater for the <u>single</u> redemption transaction than a continuing shareholder's proportionate part of the Fund's overall transfer and dividend disbursing agency charge made by FSSC for performing <u>all</u> account transactional maintenance for <u>all</u> account transactions of all shareholders for an entire year. Stated differently, the shareholder redeeming an entire account is being charged individually more for the single transaction of redemption than the same shareholder's proportionate part of the entire transfer and dividend disbursing agent fee charged for all Class K transactional account maintenance for all Class K Shareholders over the previous twelve months.

118. On information and belief, a standard transfer agent transaction charge within the mutual fund industry under standard transfer agent contracts for a redemption is generally a flat transaction fee in the range of $5 to $25, and if partially or wholly based on the size of the redemption, is generally capped at some level regardless of the amount of the redemption.  A

transaction fee of this nature for redemptions is paid by a fund as a fund expense on behalf of all shareholders and a fee of this nature is likely the type of transaction fee that FSSC charges the Fund with respect to the Class A, Class B, and Class C classes of shares of Federated Kaufmann Fund, none of which have redemption fees that are charged directly to redeeming shareholders. The Class K Redemption Fee, which has no cap for larger redemptions, is therefore manifestly excessive with respect to the services performed as well as being material and applied in a discriminatory manner among the classes and within the single Class K Shareholder group.

119. The SEC has issued a series of no-action letters over the years discussing and allowing redemption fees of up to 2% of assets to discourage short-term trading. However, the redemption fees discussed in the SEC's series of no-action letters have been limited to a stated period, generally in the range of 6 to 9 months and never for more than one year. If the redemption fee is less than 2%, as is the case with the Class K Redemption Fee, the fee is supposed to approximate the costs of processing redemptions. No SEC approved fee discussed in the various no-action letters has been perpetual. The common thread in all of these SEC pronouncements is that the redemption fees are uniformly applied to all shareholders, are limited in duration, are realized by the mutual funds, and benefit the mutual funds by reducing operating expenses.

120. When a Class K Shareholder of Federated Kaufmann Fund requests a redemption, the redemption transaction is subdivided into two separate but contemporaneous processing transactions. The Class K Shareholder's Account is reduced by the number of shares necessary to equal 99.80% of the redemption amount being processed, using the share price applicable on the date of the transaction, and a check is issued to the Shareholder for that amount. The shareholder thus does not receive 100% of the amount of the redemption being processed.

Contemporaneously, the Class K Shareholder's account is reduced by the number of shares necessary to equal 0.20% of the redemption amount, using the share price applicable on the date of the transaction.  The confirmation statement sent to the Class K Shareholder discloses the two simultaneous transactions, but does not disclose the recipient of the Class K Redemption Fee. Because the Class K Redemption Fee transaction is not classified as a "transfer" to another Federated Kaufmann Fund account, that amount presumably has been removed from Fund assets. On information and belief, the immediate recipient of the Class K Redemption Fee has been FSSC, the Federated Investors affiliate that served as transfer agent for Federated Kaufmann Fund through mid-2004 and in that capacity processed redemptions and exchanges, or FSecC, the Distributor whose name appears on the confirmation statement, or another FII affiliate involved in processing redemptions and exchanges, because the Federated Disclosure Materials indicate that the fee is applied to cover the costs of processing redemptions, including certain "employment" costs. See Exhibit L.

121. Regardless of the identity of the immediate recipient of the Class K Redemption Fee, the true recipient of the financial benefits of the Class K Redemption Fee is either FIMCO, the FII affiliate that served as investment adviser prior to December 31, 2003, FEMCO, the FII affiliate that has served as investment adviser subsequent to December 31, 2003, or FII as the ultimate parent. The FII affiliate that serves as the investment adviser, FEMCO, FIMCO and/or another affiliate, voluntarily limits all operating expenses of Federated Kaufmann Fund to a maximum of 1.95% of average fund net assets by waiving a portion of Federated Kaufmann Fund's fees. Because the gross redemption fees taken from redeeming Class K Shareholders are purportedly applied to offset the costs of processing redemptions on behalf of Class K Shareholders that Federated Kaufmann Fund would otherwise pay to its transfer agent, or for

other personnel or operating expenses, these Class K Redemption Fee proceeds thereby reduce total Fund operating expenses by an equivalent dollar amount. In so doing, Class K Redemption Fees taken from the redemption proceeds of redeeming Class K Shareholders thereby reduce dollar for dollar the amount of the fee waivers FIMCO, FEMCO, or another affiliate would otherwise incur to maintain total operating expenses at the voluntary maximum expense cap of 1.95% of assets.

122. The following example illustrates how Federated Management rather than Federated Kaufmann Fund benefits from the collection of the Class K Redemption Fee. The Federated Disclosure Materials indicate that for the fiscal year ended October 31, 2003, total operating expenses for Federated Kaufmann Fund applicable to its Class K Shares were $102,951,805, constituting 2.46% of assets. To reduce operating expenses from 2.46% to 1.95% and thereby achieve compliance with the 1.95% voluntary operating expense cap for Class K Shares for the fiscal year, it was necessary for Federated Management to reduce total operating expenses applicable to Class K Shares to $85,634,438 by waiving $17,317,367, or 0.522% of assets, such waiver including reductions of portions of the investment advisory fee and the transfer and dividend disbursing agent fee applicable to the entire Federated Kaufmann Fund, and a portion of the Rule 12b-1 Distribution Fee applicable to Class K Shareholders.  For that fiscal year, Class K Redemption Fees amounting to $447,447 were taken from the redemption proceeds of redeeming Class K Shareholders and separately applied to cover certain costs of these redemptions, including certain employment costs. See Exhibit L. If applied in this manner, as represented in the Federated Disclosure Materials, these Class K Redemption Fees thereby reduced transfer agent expenses and correspondingly reduced total operating expenses that otherwise would have been applicable to Class K Shares by the amount of $447,447.  Had the

Class K Redemption Fees not been taken from the redemption proceeds of redeeming Class K Shareholders and applied to cover certain costs of those redemptions, total operating expenses applicable to the Class K Shares would have been higher by the amount of $447,447, and Federated Management would have needed to waive an additional $447,447of its gross service fees applicable to the Class K Shares in order to achieve an operating expense ratio of 1.95% of assets for the Class K Shares.

123. The Class K Redemption Fee collected from redeeming Class K shareholders benefits FIMCO, FEMCO, or FII by reducing the amount of fee waivers under the "voluntary" 1.95% expense cap, and is therefore a direct supplement to the total fees received by one or more of these entities. Thus, the FII affiliated investment adviser or FII, by virtue of the reduction in fee waivers under the 1.95% Expense Limitation Cap that are made possible by collecting redemption fees from redeeming Class K Shareholders and applying these fees as offsets to Fund operating or transfer agent expenses, becomes the true "recipient" and direct beneficiary of these fees. The result is the same after mid-2004 when the transfer agent function was "outsourced" to a non-affiliated transfer agent, because the Federated entity that reimburses Federated Kaufmann Fund for expenses in excess of the 1.95% Expense Limitation Cap continues to receive the direct benefit of the Class K Redemption Fees collected from redeeming Class K Shareholders through a comparable reduction of the amount of its fee reimbursement under the 1.95% Expense Limitation Cap. Federated Kaufmann Fund and its continuing Class K Shareholders therefore do not receive any benefit from the Class K Redemption Fee confiscated from the redeeming Class K Shareholders, contrary to the representations in the Federated Disclosure Documents.

124. The Class K Redemption Fee is manifestly excessive when considered separately or when compared with the actual costs of processing  redemptions as demonstrated by the portion

of the transfer agency fees charged for redemptions by other classes of shares of Federated Kaufmann Fund and other mutual funds in the Federated Fund Complex; it is not reasonably related to the actual costs of processing redemptions for the Class K Shareholders to which it applies; it has been applied within the Class K shareholder group in a discriminatory manner to the individual and non-employee plan Class K Shareholders who are the majority shareholders of Federated Kaufmann Fund; it has been applied in a discriminatory manner in comparison with the other classes of shares within Federated Kaufmann Fund and in comparison with other mutual funds in Federated Equity Funds and the Federated Fund complex; its application is perpetual; and the fee does not benefit the continuing Class K Shareholders or Federated Kaufmann Fund. Imposition of this fee accordingly constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the part of FII and/or its various affiliates.

125. The Class K Redemption Fee is and continues to be disproportionate to the services rendered and is not within the range of what would have been negotiated through arms-length bargaining in good faith between the Board of Trustees of Federated Equity Funds, the umbrella entity that includes Federated Kaufmann Fund, and FII and/or its various affiliated service providers in light of all of the surrounding circumstances. As previously alleged in Paragraphs 40 and 41, herein, the Board of Trustees does not have sufficient time for and therefore the Board does not sufficiently review and consider complex fee issues involving a particular mutual fund. Moreover, as alleged in Paragraphs 42 and 43 of this Complaint, incorporated herein, Federated Management has admitted that the Federated Trustees do not consider the situation of a particular mutual fund separately, but instead the Board considers the "totality" of a variety of circumstances affecting many mutual funds and their relationships in the aggregate within the Federated Fund Complex. Approval of imposition of this 20 basis point Redemption Fee on the

Class K Shareholders without sufficient review or good faith bargaining on the part of the Board of Trustees of Federated Equity Funds with respect specifically to Federated Kaufmann Fund constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the part of the Board of Trustees of Federated Equity Funds, and its receipt of this fee constitutes a breach of fiduciary duty on the part of FII and/or its various affiliates.

126. The application of the Federated Kaufmann Fund Class K Redemption Fee to Class K Shareholders only and not to any other class of shares of Federated Kaufmann Fund or in any other mutual fund in the Federated Fund Complex, coupled with the waiver of the Class K Redemption Fee for employer sponsored employee benefit plans using Class K Shares, results in the charging of an excessive and discriminatory fee that constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the part of FII and/or its various affiliates.

127. In charging and continuing to charge the Class K Redemption Fee, which is inappropriate because it is excessive and/or is discriminatory against present and former Class K Shareholders of Federated Kaufmann Fund, Defendants have breached and continue to breach their statutory fiduciary duty to Federated Kaufmann Fund and to the Class K Shareholders of Federated Kaufmann Fund who have been forced to pay this fee, in violation of Investment Company Act Sec. 36(b).

128. According to the Federated Disclosure Materials, total Class K Redemption Fees collected from redeeming Class K Shareholders for the fiscal years ended October 31, 2003, 2004, and 2005 were $447,447, $631,121, and $688,755, respectively. If all Class K Shareholders were to redeem or were to convert their Class K Shares to Class A Shares within Federated Kaufmann Fund, a conversion being actively encouraged by Federated Management, total Class K Redemption Fees generated for the benefit of Federated Management would total

approximately $7,000,000 on Class K Share assets of approximately $3.5 billion. Pursuant to Sec. 36(b)(3) of the Investment Company Act, Plaintiff seeks on behalf of Federated Kaufmann Fund the "actual damages resulting from their breach of fiduciary duty" by Defendants, up to and including the amount of compensation or payments constituting Class K Redemption Fees confiscated from redeeming Class K Shareholders for the period of time authorized by statute. Such fees should thereupon be applied to benefit the continuing, non-redeeming Class K shareholders of Federated Kaufmann Fund. Recovery of these fees and payment over to Federated Kaufmann Fund should occur in such a manner that would reduce Federated Kaufmann Fund's total operating expenses applicable to the Class K Shareholders below the level of the "voluntary" 1.95% Expense Limitation Cap.

## COUNT IV
## INVESTMENT COMPANY ACT  Sec. 36(b)
## BREACH OF FIDUCIARY DUTY
### (Excessive and Inappropriate Class K Shareholder Services Fees)

129. Plaintiff repeats and re-alleges paragraphs 1 through 128. inclusive, of this complaint.

130. As previously alleged, Old Kaufmann before the Federated Kaufmann Reorganization was a mutual fund primarily sold directly to potential investors without payment of a front-end sales charge deducted from the proceeds to be invested, and was not sold primarily through non-affiliated broker-dealers. Shareholders purchasing directly through Old Kaufmann Fund's internal distribution channel owned more than 70% of fund assets. The Fund was also sold through the mutual fund supermarkets such as Charles Schwab & Co., Inc. and National Financial Services Corp., and through a few other non-affiliated broker/dealers, with shareholders purchasing through this channel of distribution owning less than 30% of assets.

72

131. Old Kaufmann had a "Rule 12b-1 Distribution Fee", an asset based fee, of up to 0.75% per annum (75 basis points) that financed extensive media advertising and materials used in responding to such media advertising as well as the fees and account maintenance charges for the combined or "omnibus" shareholder accounts maintained by the mutual fund supermarkets and other broker/dealers. For fiscal 1999, the last year in which the Old Kaufmann Disclosure Materials detailed the uses of the Rule 12b-1 Distribution Fees, total Rule 12b-1 Distribution Fees necessary to cover all distribution related expenses of Old Kaufmann were in the range of 0.36% per annum or 36 basis points, including the expenses associated with the extensive media advertising and responses to such advertising, as well as the expenses associated with compensating the mutual fund supermarkets and other broker/dealer compensation. For fiscal 2000, total Rule 12b-1 Distribution Expenses also approximated 0.36% or 36 basis points, including all broker/dealer compensation, which was included in the total Rule 12b-1 Distribution Fee. The public disclosure materials of Old Kaufmann do not show the uses of the Rule 12b-1 Distribution Fees collected from the Fund for fiscal 2000.

132. A "Shareholder Services Fee" is an asset based fee somewhat similar to a Rule 12b-1 Distribution Fee that is collected from a mutual fund, usually by its affiliated principal underwriter or affiliated distributor and then paid by the affiliated principal underwriter or distributor to broker/dealers that are not affiliated with the mutual fund and that charge commissions for selling mutual fund shares. A Shareholder Services Fee may cover the combined or omnibus shareholder account record-keeping and shareholder account maintenance expenses of such non-affiliated broker/dealers and also may cover other special shareholder services provided by the non-affiliated broker/dealers to their own clients who buy mutual fund shares. Such fees may also constitute "revenue sharing" by the mutual fund's affiliated principal

underwriter with the non-affiliated broker/dealers to obtain "shelf space" and thereby encourage the non-affiliated broker/dealers' registered representatives to sell the particular fund's shares to the broker/dealer's clients. The Shareholder Services Fee would usually be paid in addition to sales loads and sales commissions drawn from front-end sales loads and in addition to a Rule 12b-1 Distribution Fee. Such a Shareholder Services Fee is also paid in addition to a transfer and dividend disbursing agent fee that is charged by the affiliated transfer agent to cover the costs of maintaining shareholder transaction records for shareholders whose accounts are not maintained by non-affiliated broker/dealers.

133. To the extent not used to finance distribution, a Shareholder Services Fee may be treated as a form of administrative fee even though paid by the mutual fund's affiliated principal underwriter to non-affiliated broker/dealers. Such administrative or service fees are generally allowable under Investment Company Act Rule 18f-3, 17 CFR Sec. 270.18f-3, which prescribes the requirements of establishing various shareholder services plans, distribution plans, and other fees for mutual funds having a multi-class structure. The SEC release adopting Rule 18f-3, and Rule 18f-3(d) contemplates that each shareholder class paying such fees will receive benefits reasonably commensurate with the amount of the fees paid by the class. See  Investment Company Act Release No. IC-20915, effective April 3, 1995, 60 F.R. 11876; amended in Investment Company Act Release No. IC-22835, effective November 10, 1997, 62 F.R. 51762.

134. The Federated Fund Complex has a Shareholder Services Fee in effect for essentially all of its mutual funds and their multiple classes that are sold through non-affiliated, retail broker-dealers. For those classes of a mutual fund that are sold primarily through non-affiliated retail broker/dealers that charge commissions, as is the case with essentially all mutual funds in the Federated Fund Complex other than the Class K Shares of Federated Kaufmann

74

Fund, such other shareholder classes are likely to receive special benefits from the non-affiliated retail broker/dealers through which they purchase that are financed through a Shareholder Services Fee. In addition, the non-affiliated retail broker-dealer maintains the account records for its clients who purchase mutual fund shares, and provides monthly account statements to these clients with respect to their mutual fund holdings.

135. Old Kaufmann shares were not sold primarily through non-affiliated retail broker/dealers that charge commissions for selling mutual fund shares, and at the time of the Federated Kaufmann Reorganization, Old Kaufmann's affiliated principal underwriter or distributor did not charge a separate "Shareholder Services Fee" of this nature. Under the Federated Kaufmann Reorganization, Federated Management designated the pre-existing Old Kaufmann shareholders, who then constituted 100% of Federated Kaufmann Fund, as Class K Shareholders. Existing Class K Shareholders could purchase more shares, but there could be no new, direct Class K Shareholders. The mutual fund supermarkets and other broker/dealers that had pre-existing agreements with Old Kaufmann's affiliated principal underwriter or distributor could, however, continue to add to existing accounts and apparently could add new Class K Shareholders. However, their broker/dealer compensation had been included in the Old Kaufmann Rule 12b-1 Distribution Fee that was in effect prior to the Federated Kaufmann Reorganization.

136. Pursuant to the Federated Kaufmann Reorganization, the maximum Rule 12b-1 Distribution Fee of Old Kaufmann was dropped from 0.75% to 0.50% per annum for the Class K Shareholders. But, as previously alleged, the actual Rule 12b-1 Distribution Fees incurred by Old Kaufmann generally were less than 0.50% per annum and ran about 0.36% or 36 basis points during fiscal 1999 and 2000. As a result, reduction in the maximum Rule 12b-1 Distribution Fee

that could be charged did not result in a reduction in actual Rule 12b-1 Distribution Fees incurred with respect to the Class K Shares.  Rule 12b-1 Distribution fees of 0.50% or less were sufficient to cover all broker/dealer compensation necessary for Old Kaufmann's shareholders who were clients of the mutual fund supermarkets and other broker/dealers selling Old Kaufmann's shares, and such a fee level also supported the extensive media advertising program engaged in by Old Kaufmann without the necessity of a separate Shareholders Services Fee. In addition Old Kaufmann Fund's Rule 12b-1 Distribution Fees also were sufficient to cover any shareholder services provided for its single class of shareholders.

137. Federated Management created the Class A, B, and C shares for new shareholders of Federated Kaufmann Fund which, as with its other funds, were to be sold through non-affiliated retail broker/dealers that charge commissions for selling mutual fund shares and adopted a "Shareholder Services Fee" of 0.25% or 25 basis points for those classes similar to fees that then existed in other mutual funds in the Federated Fund Complex. This fee would be paid in addition to the Rule 12b-1 Distribution Fees applicable to these classes. The Class A, B, and C shareholders in Federated Kaufmann Fund and shareholders of corresponding classes of shares in other mutual funds in the Federated Fund Complex are presumably receiving a reasonable level of special client services and record-keeping services from the non-affiliated broker/dealers that are financed by payments of these Shareholder Services Fees.

138.   Through the Federated Kaufmann Reorganization, Federated Management added a separate "Shareholder Services Fee" of 0.25% per annum of assets or 25 basis points for the Class K Shareholders of Federated Kaufmann Fund that is in addition to the Rule 12b-1 Distribution Fee of 0.50% or 50 basis points for these Class K Shareholders. At the time of the Federated Kaufmann Reorganization, all broker/dealer compensation for all services provided by

the mutual fund supermarkets was included within the Old Kaufmann Rule 12b-1 Distribution Fee. As a result, there was no need for a separate Shareholder Services Fee of 0.25% to compensate non-affiliated, retail broker-dealers. On information and belief, this Shareholder Services Fee is collected from Federated Kaufmann Fund by FSecC, its principal underwriter and distributor, which therefore is the recipient, or another Federated affiliate.

139.   The following table, consisting of information derived from Federated Kaufmann Fund's annual reports to shareholders, shows the amounts of Shareholder Services Fees paid for each class of shares of Federated Kaufmann Fund for the period of its existence:

| Year | Class A | Class B | Class C | Class K |
|------|---------|---------|---------|---------|
| 2001 | $   40,251 | $   43,972 | $ 12,127 | $ 4,358,076 |
| 2002 | 672,641 | 684,115 | 188,062 | 7,551,003 |
| 2003 | 1,649,916 | 1,334,531 | 472,389 | 6,991,129 |
| 2004 | 3,816,357 | 2,280,559 | 1,155,791 | 8,824,042 |
| 2005 | 4,951,345 | 2,712,938 | 1,649,023 | 8,831,008 |

140. The Class K Shareholders, most of whom are direct purchasers who did not purchase through non-affiliated retail broker/dealers that charge commissions for the sale of mutual fund shares, do not receive or do not utilize significant special shareholder services that would be commensurate with the total amount of the Shareholder Services Fees paid by Federated Kaufmann Fund with respect to the Class K Shares. This fee, which provides Class K Shareholders with limited benefits, is based on a percentage of assets rather than related to the costs of the benefits actually provided the Class K Shareholders. Because the fee is based on a percentage of assets, the Class K Shareholders pay the majority of the total Shareholders Services Fee paid by all four classes of shares of Federated Kaufmann Fund. In addition to the Class K Shareholder Services Fee,  Federated Management also charges the Class K Shares a

significant "transfer and dividend disbursing agent" fee with respect to the Class K Shares for maintaining shareholder transactional records for direct purchasers. For fiscal 2003, 2004, and 2005, the Class K transfer and dividend disbursing agent fee amounted to $4,981,654, $5,102,229, and $5,215,257, respectively, approximating 60% to 70% of the Class K Shareholder Servicing Fees for those years, indicating that the Class K Shareholder Services Fees are not used to cover the costs of shareholder transactional account record-keeping for the Class K Shareholders who are direct purchasers.

141. The majority of Class K Shareholders who originally purchased shares directly from Old Kaufmann rather than purchasing through non-affiliated retail broker/dealers that charge commissions for selling mutual fund shares are not receiving <u>any</u> services from such non-affiliated retail broker/dealers, because such Class K Shareholders did not purchase through that channel of distribution. The Federated Disclosure Materials do not contain copies of agreements between Federated Kaufmann Fund and any non-affiliated retail broker/dealers authorizing or allowing direct payment by Federated Kaufmann Fund of Class K Shareholder Services Fees to any non-affiliated retail broker/dealers.

142. On information and belief, the immediate recipient of the Class K Shareholder Services Fees is FSecC, the affiliated principal underwriter and distributor, or another Federated affiliate.  But the Class K Shareholders are not receiving significant additional shareholder services from FSecC or an affiliate that are commensurate with the Shareholder Services Fees attributable to Class K Shares that FSecC or another Federated affiliate charges Federated Kaufmann Fund.  Such treatment is contrary to the intent of various Investment Company Act provisions, including Rule 18f-3, 17 CFR Sec.270.18f-3, which authorizes payments of these types of fees in a multi-class structure but contemplates that separate classes will receive benefits

that are commensurate with services performed for or on behalf of the particular class of shares to which the fee is attributable.

143.   Because the Class K Shareholders do not receive a benefit commensurate with the Shareholder Services Fee charged with respect to the Class K Shares, the amount collected is co-mingled with the Shareholder Services Fees charged with respect to the Class A, B, and C Shares, and a substantial portion of the entire Class K Shareholder Service Fee is used primarily for the benefit of the currently marketed Class A, Class B, and C Shareholders who are clients of non-affiliated retail broker/dealers. In the alternative, the Class K Shareholder Services Fee is used for other purposes that do not benefit the Class K Shareholders in a manner commensurate with the total amount of the Class K Shareholder Services Fee being charged by Federated Management with respect to the Class K Shares.

144.   Plans or programs implementing a Shareholder Services Fee must initially be adopted by a mutual fund's board of directors or board of trustees, which must first determine that the plan or program is beneficial to the mutual fund as a whole and secondly must then determine that the plan or program is beneficial to each separate class that is assessed the fee. The Federated Disclosure Materials contain no information as to the reasoning, if any, used by the Federated Trustees in determining that the Shareholder Services Fee paid by Federated Kaufmann Fund with respect to the Class K Shares would be beneficial to the Class K Shareholders as a separate class, and because of the limited amount of time available for the Federated Trustees to consider issues of particular mutual funds, the Federated Trustees have failed to make an informed determination on the basis of proper information supplied by Federated Management of the existence of significant, specific benefits of the Shareholder Services Fee attributable to the Class K Shares.   Accordingly, approval of the Class K

Shareholder Services Fee without sufficient review or good faith bargaining on the part of the Federated Trustees constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the part of the Federated Trustees and its receipt and use for other purposes by Federated Management constitutes a breach of fiduciary duty on the part of FII and/or its various affiliates.

145. The Shareholder Services Fee assessed with respect to the Class K Shares is an inappropriate charge against Federated Kaufmann Fund with respect to the closed Class K Shares and this fee has been excessive from the outset in 2001 because it provides the Class K Shares with no significant benefits commensurate with the total amount charged.

146. The Shareholder Services Fee charged Federated Kaufmann Fund with respect to the Class K Shares is and continues to be disproportionate to the services rendered to Class K Shareholders through payment of this fee and the fee is not within the range of what would have been negotiated through arms-length bargaining in good faith between the Board of Trustees of Federated Kaufmann Fund and Federated Management in light of all of the surrounding circumstances, including the limited amount of time available for consideration of the particular, specialized  issues affecting each separate mutual fund.

147. In charging and continuing to charge Federated Kaufmann Fund this excessive and inappropriate Shareholder Services Fee with respect to the Class K Shares, Defendants FSecC and /or another Federated affiliate have breached and continue to breach their statutory fiduciary duty to Federated Kaufmann Fund in violation of Sec. 36(b) of the Investment Company Act.

148. According to the Federated Kaufmann Disclosure Materials, the total Shareholder Services Fee applicable to the Class K Shareholders for the fiscal years ended October 31, 2003, 2004, and 2005 were $6,991,129, $8,824,042, and $8,831,008, respectively, and no fee waivers

under the voluntary 1.95% Expense Limitation Cap have been applied to the Class K Shareholder Services Fees. Pursuant to Sec. 36(b)(3) of the Investment Company Act, Plaintiff seeks on behalf of Federated Kaufmann Fund the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including the amount of compensation or payments constituting the Shareholder Services Fees charged to Federated Kaufmann Fund and received by FSecC or other FII affiliate with respect to the Class K Shares for the period of time authorized by statute.

**WHEREFORE,** Plaintiff demands judgment as follows:

a.       An order declaring that Defendants have violated and continue to violate Sec. 36(b) of the Investment Company Act through the receipt from Federated Kaufmann Fund of excessive and discriminatory investment advisory fees with respect to all classes of shares of Federated Kaufmann Fund, through the   receipt from the security holders of Federated Kaufmann Fund of excessive and discriminatory Class K Redemption Fees deducted from the redemption proceeds of Class K Shareholders; and through the receipt   from Federated Kaufmann Fund of excessive Shareholder Services Fees with respect to Class K Shares.

b.       An order declaring that Defendants have violated and continue to violate Sec. 206 and Sec. 215 of the Investment Advisers Act through the  failure to provide full, complete,  and accurate information to the Board of Trustees of Federated Kaufmann Fund with respect to the charging and receipt of the excessive and discriminatory fees that are the subject of the Complaint.

c.       An order preliminarily and permanently enjoining Defendants from further violations of the Investment Company Act and the Investment Advisers Act.

d.       An order awarding damages on behalf of Federated Kaufmann Fund against

Defendants, including repayment of all excessive and/or discriminatory fees paid to them by Federated Kaufmann Fund or its security holders for all periods not precluded by any applicable statutes of limitation through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

  e. An order awarding rescinding the several investment advisory agreements between the Investment Adviser Defendants and Federated Equity Funds on behalf of Federated Kaufmann Fund, including restitution of all investment advisory fees paid to them by Federated Kaufmann Fund for all periods not precluded by any applicable statutes of limitation through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

  f. Such other and further relief as may be just and proper under the circumstances.

Dated  January 12, 2006

Respectfully submitted,

      **ARMSTRONG ALLEN, PLLC**

      By:  s/ Jerome  A. Broadhurst
        Jerome A. Broadhurst
        (Tennessee BPR No. 12529)

      By:  s/ Charles  D. Reaves
        Charles D. Reaves
        (Tennessee BPR No.  22550)

      80 Monroe Avenue, Suite 700
      Memphis, Tennessee 38103-2467
      (901) 523-8211

      Attorneys for Plaintiff

82

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed a copy of the foregoing using the CM/ECF system, which will send notification of such filing to registered counsel electronically.  The Second Amended Complaint will also be served on this 12th day of January, 2006 via first-class mail, postage pre-paid, on the following parties:

**Served upon defendants in Civil Action Nos. 04cv0352, 04cv0719 and 05cv201:**

>    Thomas L. Allen, Esq.
>    Perry A. Napolitano, Esq.
>    Roy W. Arnold, Esq.
>    David J. Bird, Esq.
>    Casey C. Dick, Esq.
>    REED SMITH LLP
>    435 Sixth Avenue
>    Pittsburgh, PA 15219
>
>    *Attorneys for Defendants Federated Investors, Inc., Federated Investment Management Company and Federated Global Investment Management Corp.*
>
>    Robert J. Higgins, Esq.
>    Eric Bensky, Esq.
>    DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP
>    2101 L Street NW
>    Washington, DC 20037-1526
>
>    *Attorneys for all Defendants other than Federated Investors, Inc.; Federated Investment Management Company; Federated Global Investment Management Corp.; American Skandia Advisor Funds Inc. – Federated High Yield Bond Fund; ASAF – Federated High Yield Bond Fund; Federated International Funds PLC – High Income Advantage Fund; Federated International Funds PLC – Short-Term Euro Fund; Federated International Funds PLC – Short-Term US Government Securities Fund; Federated International Funds PLC – Short Term US Prime Fund; Federated International Funds PLC – Short Term US Treasury Securities Fund; and IDEX Federated Tax Exempt Fund*
>
>    Carole S. Katz, Esq.
>    MORGAN, LEWIS & BOCKIUS LLP
>    One Oxford Centre, 32nd Floor
>    301 Grant Street
>    Pittsburg, PA 15219

Joshua Pepper, Esq.
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 19178

Christian R. Bartholomew, Esq.
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004

*Attorneys for Defendant IDEX Federated Tax Exempt Fund*

American Skandia Advisor Funds, Inc. – Federated High Yield Bond Fund
(a.k.a. ASAF – Federated High Yield Bond Fund)
c/o Boyd Cloern, Esq.
CLIFFORD CHANCE US LLP
The William P. Rogers Building
2001 K Street NW
Washington, DC 20006-1001

**Served upon defendants in Civil Action No. 04cv0702:**

Thomas L. Allen, Esq.
Perry A. Napolitano, Esq.
Roy W. Arnold, Esq.
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219

*Attorneys for Defendants Federated Equity Management Company of Pennsylvania, Federated Securities Corp., Federated Advisory Services Company, Federated Global Investment Management Corp., Passport Research II, Ltd., Federated Investment Management Company*

**Served upon defendants in Civil Action No. 04cv855:**

Thomas L. Allen, Esq.
Perry A. Napolitano, Esq.
Roy W. Arnold, Esq.
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219

*Attorneys for Defendants Federated Equity Management Company of Pennsylvania, Federated Securities Corp., Federated Advisory Services Company, Federated Global*

*Investment Management Corp., Passport Research II, Ltd., Federated Investment
Management Company*

**Served upon plaintiffs in Civil Action Nos. 04cv0702 and 04cv0855:**

Ellen M. Doyle, Esq.
MALAKOFF, DOYLE & FINBERG
200 Frick Building
Pittsburgh, PA 15219

Guy M. Burns, Esq.
Jonathan S. Coleman, Esq.
Becky Ferrell-Anton, Esq.
JOHNSON, POPE, BOKOR, RUPPEL & BURNS
100 North Tampa Street, Suite 1800
Tampa, FL 33601-1100

James C. Bradley, Esq.
Nina H. Fields, Esq.
Michael J. Brickman, Esq.
RICHARDSON, PATRICK, WESTBROOKE & BRICKMAN
174 East Bay Street
Charleston, SC 29401

Lynn Lincoln Sarko, Esq.
Gretchen Freeman Cappio, Esq.
Michael D. Woerner, Esq.
KELLER ROHRBACK
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

**Service upon plaintiffs in Civil Action No. 04cv0352:**

Steven G. Schulman, Esq.
Jerome M. Congress, Esq.
Janine L. Pollack, Esq.
Kim E. Miller, Esq.
Michael R. Reese, Esq.
MILBERG WEISS BERSHAD & SHULMAN LLP
One Pennsylvania Plaza
New York, NY 10119
*Plaintiffs' Lead Counsel*

Alfred G. Yates, Jr., Esq.
Gerald L. Rutledge, Esq.
Law Office of Alfred G. Yates, Jr.
429 Forbes Avenue
519 Allegheny Building
Pittsburgh, PA 15219
*Plaintiffs' Liaison Counsel*

Charles J. Piven, Esq.
Marshall N. Perkins, Esq.
Law Offices of Charles Piven
The World Trade Center
401 East Pratt Street
Suite 2525
Baltimore, MD 21202

**ARMSTRONG ALLEN, PLLC**

By:  s/ Charles  D. Reaves
　　　Charles D. Reaves

K:\JAB\Pleadings\Reaves\CERTIFICATE OF SERVICE 1-12-06.doc